## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN CURAVO, derivatively on behalf of FMC CORPORATION,<br><br>     Plaintiff,<br><br>     vs.<br><br>MARK A. DOUGLAS, ANDREW D. SANDIFER, PIERRE R. BRONDEAU, EDUARDO E. CORDEIRO, CAROL ANTHONY ("JOHN") DAVIDSON, KATHY L. FORTMANN, C. SCOTT GREER, K'LYNNE JOHNSON, DIRK A. KEMPTHORNE, MARGARETH ØVRUM, ROBERT C. PALLASH, PATRICIA VERDUIN, PAUL J. NORRIS, and VINCENT R. VOLPE, JR.,<br><br>     Defendants,<br><br>     and<br><br>FMC CORPORATION,<br><br>     Nominal Defendant. | Case No.: _____<br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Steven Curavo ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant FMC Corporation ("FMC" or the "Company"), files this Verified Shareholder Derivative Complaint against Mark A. Douglas ("Douglas"), Andrew D. Sandifer ("Sandifer"), Pierre R. Brondeau ("Brondeau"), Eduardo E. Cordeiro ("Cordeiro"),  Carol Anthony "John" Davidson ("Davidson"), Kathy L. Fortmann ("Fortmann"), C. Scott Greer ("Greer"), K'Lynne Johnson ("Johnson"), Dirk A. Kempthorne ("Kempthorne"), Margareth

Øvrum ("Øvrum"), Robert C. Pallash ("Pallash"), Patricia Verduin ("Verduin"), Paul J. Norris ("Norris"), and Vincent R. Volpe, Jr. ("Volpe") (collectively, the "Individual Defendants," and together with FMC, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of FMC, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Douglas and Sandifer for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding FMC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by FMC's directors and officers from February 9, 2022 to October 30, 2023, inclusive (the "Relevant Period").

2.      FMC is a Delaware-incorporated company that develops and sells a range of crop protection products, including seed treatments, insecticides, herbicides, and fungicides. FMC sells its products primarily to distributors in North and Latin America, Europe, and Asia, who in turn sell said products to retailers who ultimately sell to end-users. These markets can be broken down

geographically into four major regions: North America, Latin America ("LATAM"), Asia-Pacific ("APAC"), and Europe, the Middle East, and Africa ("EMEA").

3.      The Company acquired two diamide-class insecticides, Rynaxypyr and Cyazypyr, in 2017 from DuPont for a total of $1.2 billion. FMC touted this acquisition as being a transformative event for the Company, with a potential to generate sufficient revenue to position the Company as one of the largest agricultural companies worldwide.

4.      Throughout the Relevant Period, the Individual defendants made statements that were materially false or misleading and/or failed to state material adverse facts necessary to make the statements not false and/or misleading. The Individual Defendants did so by failing to disclose, *inter alia*, that: (1) FMC's distributors and many of its retailers had, as a result of overbuying because of feared supply chain disruptions wrought by the COVID-19 pandemic (the "Pandemic"), accumulated excessive inventory; (2) because these customers carried excessive inventories, demand for FMC's products began significantly declining in 2022 and 2023; (3) FMC's margins suffered as the Company attempted to boost sales through discounts and received numerous returns of products that had been pre-purchased during the Pandemic; (4) the introduction of low-cost generic competitors to the Company's largest revenue-generating products,  Rynaxypyr and Cyazypyr, further hurt demand; (5) FMC's revenue growth was further hampered by consolidation of FMC's distributors; and (6) because of the foregoing, positive statements made concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

5.      The truth began to emerge on May 1, 2023, when FMC announced reduced guidance for the second fiscal quarter of 2023, which it attributed primarily to channel inventory management and adjustment, particularly in the Indian market.

6.      On July 10, 2023, the Company issued a subsequent partially corrective disclosure when it once again reduced its guidance for the second quarter of 2023 and additionally reduced its guidance for the full 2023 fiscal year. In a press release issued the same day, the Company's then-President and CEO, Defendant Douglas, stated that FMC had seen "unforeseen and unprecedented volume declines in three out of four of [FMC's] operating regions . . . as [the Company's] partners rapidly reduced inventory levels."

7.      On this news, the Company's stock price fell more than 11% in one day, from a closing price of $104.25 per share on Friday, July 7, 2023 to close at $92.63 per share on Monday, July 10, 2023.

8.      The truth continued to emerge on September 7, 2023 when Blue Orca Capital published a report (the "Blue Orca Report"), which revealed previously undisclosed litigation losses suffered by FMC in China and India. These litigation losses pertained to the enforceability in India and China of the Company's patents for its flagship products, the diamide insecticides Rynaxypyr and Cyazypyr (the "Diamide Products"). The Blue Orca Report detailed a significant rise of generic diamide products into the India, Chinese, and Brazilian markets.

9.      On this news, the price of the Company's stock price fell 7.4% in a single day, from a closing price of $82.19 per share on September 6, 2023, to close at $76.10 per share on September 7, 2023.

10.     The truth continued to emerge on October 23, 2023 when the Company disclosed further details about its issues with channel inventories, including that the Company did not anticipate "destocking conditions . . . to improve in the near-term." The Company at this time also reduced its third quarter, fourth quarter, and full-year 2023 revenue and EBITDA guidance significantly.

11.    On this news, the Company's stock price fell approximately 16% in a single day, from a closing price of $66.95 per share on October 20, 2023 to close at $56.11 per share on October 24, 2023.

12.    The truth fully emerged on October 30, 2023 when the Company revealed in a press release (the "October 30, 2023 Press Release") that it was experiencing significant cash flow limitations as a result of "higher inventory and lower payables." In the press release, the Company further revealed that it had experienced lower than expected revenues across all four of the Company's regions, largely as a result of "[l]ower volumes in all regions caused by destocking from channel customers and partners."

13.    On this news, the Company's stock price fell more than 8%, from a closing price of $57.96 per share on October 30, 2023, to close at $53.20 per share on October 31, 2023.

14.    During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by making a series of materially false and misleading statements to the investing public which failed to disclose, *inter alia*, that: (1) FMC's distributors and many of its retailers had, as a result of overbuying because of feared supply chain disruptions wrought by the Pandemic, accumulated excessive inventory; (2) because these customers carried excessive inventories, demand for FMC's products began significantly declining in 2022 and 2023; (3) FMC's margins suffered as the Company attempted to boost sales through discounts and received numerous returns of products that had been pre-purchased during the Pandemic; (4) the introduction of low-cost generic competitors to the Company's largest revenue-generating products, Rynaxypyr and Cyazypyr, further hurt demand; (5) FMC's revenue growth was further hampered by consolidation of FMC's distributors; and (6) because of the foregoing, positive

statements made concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

15.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. The Company repurchased approximately 1,841,789 shares at artificially inflated prices between February 2022 and October 2023, for a total of approximately $213.9 million. As the Company's stock was only worth $53.20 per share, the price at which it was closing when the market closed on October 31, 2023, the Company overpaid by approximately $115.98 million in total for repurchases of its own stock during the Relevant Period.

16.     Moreover, during the Relevant Period, five of the Individual Defendants conducted lucrative insider sales while in possession of material nonpublic information in breach of their fiduciary duties to FMC. Indeed, in total, Defendants Brondeau, Douglas, Sandifer, Johnson, and Volpe sold 74,862 shares of Company common stock at artificially inflated prices for combined total proceeds of approximately $9.01 million.

17.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially

damaged because of the Individual Defendants' knowing or reckless breaches of their fiduciary duties, and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of FMC. Plaintiff has continuously held FMC common stock at all relevant times.

### Nominal Defendant FMC

24.     FMC is a Delaware corporation with principal executive offices at 2929 Walnut Street, Philadelphia, Pennsylvania, 19104. FMC's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FMC."

### Defendant Douglas

25.     Defendant Douglas served as President and Chief Executive Officer ("CEO") of FMC from June 2020 until June 2024 and as President and Chief Operating Officer ("COO") from June 2018 until June 2020. Defendant Douglas previously served as Vice President, Global Operations and International Development of FMC.

26.     The Schedule 14A the Company filed with the SEC on March 15, 2024 (the "2024 Proxy Statement") stated the following about Defendant Douglas:

> Mr. Douglas was appointed President and Chief Executive Officer on June 1, 2020. He served as President and Chief Operating Officer of FMC from June 2018 until June 2020. He joined FMC in March 2010 as Vice President, Global Operations and International Development, and has served as President of the Industrial Chemicals Group and President of the Agricultural Solutions business. Mr. Douglas joined FMC from The Dow Chemical Company where he was Vice President, President Asia, Dow Advanced Materials. Prior to Dow, he was Corporate Vice President, President Asia, Rohm and Haas Company, based in Shanghai. During his twenty-one years with Rohm and Haas, Mr. Douglas held sales, marketing and executive management positions in London, Singapore, Shanghai, and Philadelphia.

27.     During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Douglas made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| February 22, 2022 | 2,041 | $116.89 | $238,572.49 |
| February 24, 2022 | 5,216 | $114.69 | $598,223.04 |
| February 23, 2023 | 8,477 | $128.73 | $1,091,244.21 |
| February 27, 2023 | 3,359 | $128.78 | $432,874.33 |

Thus, in total, before the fraud was exposed, Defendant Douglas sold a total of 19,093 shares of Company common stock on inside information for a total of approximately $2.36 million in proceeds. Defendant Douglas's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Sandifer**

28.     Defendant Sandifer has served as the Company's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since May 2018. Defendant Sandifer previously joined FMC in 2010 as its Vice President, Strategic Development.

29.     The Schedule 14A the Company filed with the SEC on March 14, 2025 (the "2025 Proxy Statement") stated the following about Defendant Sandifer:

> Andrew Sandifer was named executive vice president and chief financial officer in May 2018. Andrew joined FMC in 2010 as vice president, Strategic Development, with overall responsibility for all mergers and acquisitions and strategic planning activities. He was named vice president, Corporate Transformation in 2014 and led several efforts to transform FMC's portfolio, including leading the enterprise-wide integration of Cheminova A/S, a global agricultural chemical company acquired by FMC, until being named Treasurer in 2016. Before joining FMC, Andrew was vice president, Strategic Initiatives, for ARAMARK Corporation. Prior to ARAMARK, he spent seven years with Rohm and Haas Company, now part of The Dow Chemical Company, where he held roles in Strategic Planning, Sales, Marketing, Investor Relations, and General Management. Earlier in his career Andrew spent five years with the Boston Consulting Group and held engineering, operations, and technical roles with International Paper and James River Paper companies. Andrew earned bachelor's and master's degrees in Industrial Engineering from Georgia Tech, and received his MBA from Harvard Business School. Andrew serves on the Board of Directors for Koppers Holdings Inc., as well as on the Board of Trustees of Germantown Academy, where he is a member of the Finance, Audit, and Investment Committees.

30.    During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Sandifer made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 22, 2022 | 1,312 | $116.89 | $153,359.68 |
| February 24, 2022 | 2,806 | $114.69 | $321,820.14 |
| March 4, 2022 | 4,997 | $119.36 | $596,441.92 |
| February 23, 2023 | 1,482 | $128.73 | $190,777.86 |
| February 27, 2023 | 983 | $128.87 | $126,679.21 |
| March 3, 2023 | 5,000 | $127.77 | $638,835 |

Thus, in total, before the fraud was exposed, Defendant Sandifer sold a total of 16,580 shares of Company common stock on inside information for a total of approximately $2.08 million in proceeds. Defendant Sandifer's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Brondeau**

31.    Defendant Brondeau has served as the Company's CEO since June 2024 and as Chairman of the Board since October 2010. He was also CEO of FMC from January 2010 until May 2020, President from January 2010 until May 2018, and Executive Chairman from June 2020 until April 2021.

32.    The 2025 Proxy Statement stated the following about Defendant Brondeau:

Mr. Brondeau became Chief Executive Officer in June 2024 and has served as Chairman of the Board since October 2010. He was also Chief Executive Officer of FMC from January 2010 until May 2020, President from January 2010 until May 2018, and Executive Chairman from June 2020 to April 2021. Before joining the Company as President and Chief Executive Officer in January 2010, Mr. Brondeau served as President and Chief Executive Officer, Dow Advanced Materials Division, until his retirement in September 2009. Prior to Dow's acquisition of Rohm and Haas Company in April 2009, he was President and Chief Operating Officer of Rohm and Haas from May 2008. Mr. Brondeau held numerous executive

positions during his tenure at Rohm and Haas from 1989 through May 2008 in Europe and the United States, with global responsibilities for marketing, sales, research and development, engineering, technology and operations.

33.    During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Brondeau made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 22, 2022 | 5,844 | $116.89 | $687,780.76 |
| February 24, 2022 | 23,935 | $114.69 | $2,745,105.15 |
| February 23, 2023 | 5,361 | $128.73 | $690,121.53 |
| February 27, 2023 | 2,318 | $128.87 | $298,720.66 |

Thus, in total, before the fraud was exposed, Defendant Brondeau sold a total of 37,458 shares of Company common stock on inside information for a total of approximately $4.42 million in proceeds. Defendant Brondeau's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Cordeiro**

34.    Defendant Cordeiro has served as a Company director since 2011. Defendant Cordeiro also serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee and Executive Committee.

35.    The 2025 Proxy Statement stated the following about Defendant Cordeiro:

Mr. Cordeiro served as Executive Vice President and Chief Financial Officer of Cabot Corporation from 2009 until May 2018, and served as an advisor to Cabot through the remainder of 2018. He joined Cabot in 1998 and has held several corporate, business and executive management positions including General Manager of Cabot's Fumed Metal Oxides and Tantalum businesses, Vice President of Corporate Strategy, and President of the Americas Region. Prior to joining Cabot, Mr. Cordeiro was a consultant with The Boston Consulting Group and a founding partner of The Economics Resource Group.

**Defendant Davidson**

36.     Defendant Davidson has served as a Company director since July 2020. Defendant Davidson also serves as Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee.

37.     The 2025 Proxy Statement stated the following about Defendant Davidson:

Mr. Davidson was elected to the Company's Board of Directors in July 2020. He served as Senior Vice President, Controller and Chief Accounting Officer of Tyco International from 2004 to 2012 where he led financial reporting, internal controls and accounting policies and processes. Prior to Tyco, Mr. Davidson held senior global leadership positions in finance and related disciplines at Eastman Kodak Company and Dell Computer Corporation. He is a Certified Public Accountant and began his career at Arthur Andersen & Co.

**Defendant Fortmann**

38.     Defendant Fortmann has served as a Company director since 2022. Defendant Fortmann also serves as a member of the Compensation and Human Capital Committee and the Nominating and Corporate Governance Committee.

39.     The 2025 Proxy Statement stated the following about Defendant Fortmann:

Ms. Fortmann has served as Chief Executive Officer of Amyris, Inc., a synthetic biology company, since May 2024. She most recently served, from September 2021 to November 2023, as CEO of ACOMO N.V. (formerly known as Amsterdam Commodities N.V.), a Euronext Amsterdam-listed natural food ingredients company. Ms. Fortmann began her career with DuPont where she held many technical and business roles over her fifteen-year tenure there. From September 2017 through March 2020, she was employed by Royal FrieslandCampina N.V. as its President, FrieslandCampina Ingredients, where she restructured its food ingredients business. In April 2020, she joined International Flavors & Fragrances Inc. where she led the integration of the company and DuPont's ingredients businesses to form the largest ($6 billion) business within International Flavors & Fragrances from 2020 to 2021.

**Defendant Greer**

40.     Defendant Greer has served as a Company director since 2002. Defendant Greer also serves as the Lead Independent Director, as a member of the Executive Committee, and as a member of the Nominating and Corporate Governance Committee.

41.    The 2025 Proxy Statement stated the following about Defendant Greer:

Beginning in June 2006, Mr. Greer was a principal in Greer and Associates, a private investment management firm, until his retirement in 2021. Prior to Greer and Associates, from 1999 until 2005, Mr. Greer held various roles at Flowserve Corporation (a manufacturer of industrial flow management equipment), including President and Chief Operating Officer, as well as Chairman, President and Chief Executive Officer.

**Defendant Johnson**

42.    Defendant Johnson has served as a Company director since 2013. Defendant Johnson also serves as Chair of the Compensation and Human Capital Committee and as a member of the Executive Committee and the Sustainability Committee.

43.    The 2025 Proxy Statement stated the following about Defendant Johnson:

Ms. Johnson was Executive Chair of Elevance Renewable Sciences, Inc. from October 2015 until February 2016. Prior to being named Executive Chair, Ms. Johnson served for eight years as CEO and President. Previously, Ms. Johnson served as Senior Vice President of the Global Derivatives operating company within BP Innovene, one of the world's largest global petrochemical and refining companies. She has served in a variety of leadership and executive positions for twenty-five years at Amoco Corporation, BP Chemicals, BP Innovene and Elevance.

44.    During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Johnson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 3, 2023 | 37 | $124.80 | $4,617.60 |

Thus, in total, before the fraud was exposed, Defendant Johnson sold a total of 37 shares of Company common stock on inside information for a total of approximately $4,618 in proceeds. Defendant Johnson's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

**Defendant Kempthorne**

45.    Defendant Kempthorne has served as a Company director since 2009. Defendant Kempthorne also serves as the Chair of the Sustainability Committee and as a member the Compensation and Human Capital Committee.

46.    The 2025 Proxy Statement stated the following about Defendant Kempthorne:

47.    Governor Kempthorne served as President and CEO of the American Council of Life Insurers from 2010 to 2018. Prior to that, he served as the 49th United States Secretary of the Interior from June 2006 until January 2009. From January 1999 until his appointment as Secretary of the Interior, Governor Kempthorne served as the Governor of Idaho. Governor Kempthorne has been Chairman of the National Governors Association, Chairman of the Western Governors Association and President of the Council of State Governments. He also served as a member of the Homeland Security Task Force.

**Defendant Øvrum**

48.    Defendant Øvrum has served as a Company director since 2016. Defendant Øvrum also serves as a member of the Sustainability Committee and the Nominating and Corporate Governance Committee.

49.    The 2025 Proxy Statement stated the following about Defendant Øvrum:

Until her retirement in January 2021, Ms. Øvrum served as Executive Vice President of Equinor ASA (formerly known as Statoil ASA) and served on the company's Corporate Executive Committee, to which she had been appointed in 2004. In October 2018, she was named Executive Vice President, Development & Production Brazil. Over her career, Ms. Øvrum has had global responsibility for new energy, health, safety & environment, technology, research, procurement, projects, and drilling. Prior to her most recent position, she held numerous senior leadership positions within Equinor, including Executive Vice President, Technology, Projects & Drilling; Executive Vice President, Technology and New Energy; Executive Vice President, Health, Environment and Safety; Senior Vice President, Operations Support; Vice President, Veslefrikk Field; and Platform Manager.

**Defendant Pallash**

50.    Defendant Pallash has served as a Company director since 2008. Defendant Pallash also serves as a member of the Audit Committee and the Sustainability Committee.

51.    The 2025 Proxy Statement stated the following about Defendant Pallash:

Mr. Pallash joined Visteon Corporation, an automotive parts manufacturer, in September 2001 and, from 2008 to 2013, Mr. Pallash served as its President, Global Customer Group and Senior Vice President. While at Visteon Corporation, Mr. Pallash also served as its Vice President, Asia Pacific and, subsequently, Senior Vice President, Asia Customer Group.

**Defendant Verduin**

52.    Defendant Verduin has served as a Company director since 2023. Defendant Verduin also serves as a member of the Compensation and Human Capital Committee and as a member of the Sustainability Committee.

53.    The 2025 Proxy Statement stated the following about Defendant Verduin:

**Dr. Patricia Verduin** served as Chief Technology & Science Officer of Colgate Palmolive Company from 2009 to 2023, where she navigated complex global regulatory environments and led a global team of over 2,000 scientists, engineers, designers, regulatory, and compliance specialists. In her role at Colgate Palmolive Company, Dr. Verduin had responsibility for driving product formula, manufacturing, and product related sustainable footprint improvements. Prior to her role at Colgate Palmolive Company, she held leadership positions at ConAgra Foods (now known as Conagra Brands, Inc.), Nabisco, and the Consumer Brands Association.

**Defendant Volpe**

54.    Defendant Volpe served as a member of the Board from 2007 until April 2023. The Schedule 14A the Company filed with the SEC on March 11, 2022 (the "2022 Proxy Statement") stated the following about Defendant Volpe:

In 2015 Mr. Volpe became Chairman, CEO, President and Principal of the LeHavre Athletic Club, France's oldest professional soccer team. Until September 2015, Mr. Volpe was the Chief Executive Officer, President and a director of Dresser-Rand Group, Inc., a leading supplier of rotating equipment solutions to the worldwide oil, gas, petrochemical and process industries. He had served in those positions since his election in September 2000. Previously he served as Chief Operating Officer of Dresser-Rand Group, Inc. from 1999 until September 2000. After joining Dresser-Rand in 1981, Mr. Volpe held several diverse management positions. He served as President, Turbo Products Division from 1997-1999; President-Europe from 1996-1997; Vice President and General Manager, Turbo Products Division-European Operations from 1993-1996; Executive Vice President, European

Operations from 1992-93; and Vice President, Marketing and Engineering, Steam & Turbo Products-European Operations.

55.    During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Volpe made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 27, 2022 | 1,694 | $119.82 | $202,975.08 |

Thus, in total, before the fraud was exposed, Defendant Volpe sold a total of 1,694 shares of Company common stock on inside information for a total of approximately $202,975.08 in proceeds. Defendant Volpe's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

**Defendant Norris**

56.    Defendant Norris served as a member of the Board from 2006 until April 2023.

57.    The 2022 Proxy Statement stated the following about Defendant Norris:

Until May 2005, Mr. Norris served as Chairman and Chief Executive Officer of W. R. Grace & Co., a manufacturer of specialty chemicals. Mr. Norris was actively engaged in W. R. Grace's businesses for the six years prior to his retirement as Chief Executive Officer. He resigned as a member of W. R. Grace's Board of Directors in February 2010. Mr. Norris joined W.R. Grace as President and CEO in November 1998 and became Chairman in January 1999. Prior to joining W.R. Grace, Mr. Norris was at AlliedSignal Inc. (now known as Honeywell) for nine years and served as Senior Vice President and President, Specialty Chemicals, from 1997 to 1998; President, AlliedSignal Polymers Division from 1994 to 1997; and President, AlliedSignal Chemicals & Catalysts (formerly Fluorine Products Division) from 1989 to 1994. From 1981 to 1989, Mr. Norris served in various executive capacities with Engelhard Corporation (now a part of BASF Corporation), including President of Catalysts and Chemicals, Senior Vice President and General Manager of Catalysts, and Vice President and Business Director for Petroleum Catalysts.

**Relevant Non-Parties**

58.    This action incorporates information from public documents including the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class Action, which itself incorporates statements from former employees of FMC who offered their experiences as confidential witnesses. The following are the former employees whose statements are referenced throughout this complaint before this court.

### FE-1

59.    FE-1 worked for the Company from 2019 until mid-2022. Beginning in early 2021, FE-1 worked as a Manager for the Company's Structured Finance Group for its LATAM region. As such, FE-1 issued credit to FMC customers and managed the sale of customer debt to third parties. FE-1 reported to William Mills, FMC's CFO for the Americas, who reported directly to Defendant Sandifer.

### FE-2

60.    FE-2 worked for the Company for over twenty-five years, until early 2022. For most of this time, FE-2 worked as a manager of FMC's business in multiple countries in Southwest Asia. FE-2 reported directly to the head of FMC's Asia-Pacific segment.

### FE-3

61.    FE-3 worked for the Company for over four years, until mid-2022. FE-3 was employed as a member of the Company's Demand Planning team for its EMEA segment. As such, FE-3 was responsible for oversight of supply chains, sales, and demand trends. FE-3 reported to the heads of the Company's European business, Marc Hullebroek and Sebastian Pons, each of whom reported in turn to Defendant Douglas.

### FE-4

62.      FE-4 worked for FMC for over twenty years, until mid-2022. From 2020 onwards, FE-4 worked for the Company's Product Engineering and Precision Agriculture Group. FE-4's responsibilities included, *inter alia*, expanding the use of mechanical application technologies with the Company's products by farmers.

### *FE-5*

63.      FE-5 worked at FMC from late 2022 until early 2024 at the Company's headquarters in Philadelphia, Pennsylvania. FE-5 was a member of the Integrated Accounts Team for the North America region, and his responsibilities, *inter alia*, included oversight of orders made by distributors across the North American region.

### *FE-6*

64.      FE-6 worked at FMC for over twelve years, until mid-2022. For the last five years of FE-6's employment at FMC, FE-6 worked as a manager for the Company's Pakistan business. In this position, FE-6 was responsible for, *inter alia*, procurement, product warehousing, and supplying FMC's Pakistani dealers.

### *FE-7*

65.      FE-7 worked at FMC for over ten years, until early 2022. FE-7 was a manager in FMC's Finance and Supply Chain Group for its Southwest Asia operations. In this position. FE-7 reported to Sujit Mukherjee, who was FMC's Director of Asia Finance and as such reported directly to Defendant Sandifer.

### *FE-8*

66.      FE-8 worked at FMC for over three years, until early 2022. FE-8 was a member of FMC's Enterprise Governance and Continuous Improvement Group and additionally worked in Business Process Management at FMC's Philadelphia, Pennsylvania headquarters. FE-8's team

was primarily responsible for implementing a Systems Applications and Data Processing ("SAP") program. The SAP program was a centralized system enabling FMC to access Company-wide data pertaining to all facets of its business, including invoices, sales, pricing, and inventory.

### FE-9

67.     FE-9 worked for FMC for over seven years, until mid-2024, as a Regional Business Manager in the Midwest United States. FE-9 was primarily responsible for facilitating sales by FMC to its distributors and from those distributors to retailers. FE-9 reported to Regional Director Randy Young, who reported to FMC's Director of Sales for North America. This Director of Sales for North America reported directly to Defendant Douglas.

### FE-10

68.     FE-10 worked for FMC for over twenty years, until early 2024, as a Retail Market Manager in the Midwest United States and was primarily responsible for working with distributors to facilitate their purchases of FMC products.

### FE-11

69.     FE-11 worked at FMC from early 2020 until early 2023 as a Regional Sales Manager for the Midwest United States. FE-11 was primarily responsible for facilitating the sale of Company products from distributors to retailers, as well as handling customer complaints. FE-11 worked closely with retailers to ensure they had adequate supplies of FMC products, including Diamides.

### FE-12

70.     FE-12 worked at FMC from 2019 until late 2022 as a Global Research and Development Scientist. FE-12 worked with process engineering and related patents for the Company's products, including FMC's diamide products.

*FE-14*

71.     FE-14 worked at FMC for over eight years, until early 2023. During this time, FE-14 worked as a National Sales Manager in the Company's Southwest Asia segment. In that position, FE-14 worked with FMC's Country Manager to facilitate the sale of Company products to distributors and dealers.

*FE-16*

72.     FE-16 worked at FMC from mid-2023 until late 2024 as an Analyst in FMC's Financial Planning and Analysis Group at the Company's Philadelphia, Pennsylvania headquarters. FE-16 was responsible, *inter alia*, for financing matters related to third-party manufacturers of FMC products.

*FE-19*

73.     FE-19 worked at FMC for more than five years, until mid-2023, in FMC's Finance Team and Demand Team for EMEA. In this position, FE-19 duties involved, *inter alia*, managing financial matters related to the Company's operations in Southwest Europe, as well as monitoring demand for the FMC products across EMEA.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

74.     By reason of their positions as officers, directors, and/or fiduciaries of FMC and because of their ability to control the business and corporate affairs of FMC, the Individual Defendants owed FMC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FMC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of FMC and its shareholders so as to benefit all shareholders equally.

75.     Each director and officer of the Company owes to FMC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

76.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of FMC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

77.     To discharge their duties, the officers and directors of FMC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

78.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of FMC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants, who collectively comprised a majority of FMC's Board at all relevant times.

79.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

80.    To discharge their duties, the officers and directors of FMC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of FMC were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to FMC's own Code of Ethics & Business Conduct (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how FMC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of FMC and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that FMC's operations would comply with all applicable laws and FMC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

81.    Each of the Individual Defendants further owed to FMC and the shareholders the duty of loyalty requiring that each favor FMC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

82.    At all times relevant hereto, the Individual Defendants were the agents of each other and of FMC and were at all times acting within the course and scope of such agency.

83.    Because of their advisory, executive, managerial, directorial, and controlling positions with FMC, each of the Individual Defendants had access to adverse, non-public information about the Company.

84.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by FMC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

87.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of FMC was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

88.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

89.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of FMC and was at all times acting within the course and scope of such agency.

## FMC'S CODE OF ETHICS

90.    According to the Company's Code of Ethics, "[b]ehavior reflecting high ethical standards is expected of all directors, employees and others who are bound by the Code, regardless of position or location," and "[n]o director, officer, manager or supervisor has the authority to violate or require conduct by another employee or any other person that violates the Code, other FMC policies or applicable law."

91.    The Board represents that it adopted the Code of Ethics in part to make clear that all "FMC officers, managers and supervisors are accountable for the actions of the employees who report to them and responsible for seeing that the Code, other FMC policies and applicable laws are followed."

92.    In a section titled "We Comply with the Code, Other FMC Policies, and All Applicable Laws," the Code of Ethics states the following:

We comply with the Code, other FMC policies and all applicable laws in conducting our business. There are countries where common trading or negotiating practices are based on codes of conduct that are less stringent or different than the Code. In such countries, employees should follow the Code, except for variances that are permitted by applicable law and are based on good ethical and business judgment. The relevant regional president or department head, or a president or vice president of FMC Corporation if no division manager is available, must approve any such variance in writing. Contact an FMC lawyer if you have any questions about the application of the law of any country, about the Code, or about the relation or any apparent conflict between them.

93.     In a section titled "We Keep Accurate Company Records and Make Full, Fair,

Accurate, Timely and Understandable Disclosures," the Code of Ethics states the following:

We make full, fair, accurate, timely and understandable disclosures in reports that FMC files under applicable laws, rules and regulations and in other public communications. Dishonest reporting, both inside and outside the company will not be tolerated. This includes reporting or organizing information in an attempt to mislead or misinform. No entry will be made on the company's books and records that intentionally hides or disguises the true nature of any transaction. FMC has adopted controls to ensure the safeguarding of FMC assets and the accuracy of its financial records and reports in accordance with internal needs and requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All employees, within their area of responsibility, are expected to adhere to these procedures, as directed by the appropriate FMC manager.

94.     In a section titled "We Avoid Conflicts of Interest," the Code of Ethics states the

following, in relevant part:

We shall not engage in any activity that would create a conflict of interest between our personal interests (including the interests of our immediate families* ) and the best interests of FMC. We will make all business decisions in the best interests of FMC. Any actual or potential conflict of interest between FMC and us is prohibited unless specifically approved in writing by our supervisor (or in the case of a director, the Board of Directors), who shall consult with the General Counsel concerning the matter. In determining the presence or absence of a conflict of interest, the following will be considered: the amount of our financial interest; our position with FMC and the influence that we may have in business dealings that impact the matter; and all other relevant factors.

95.     In a section titled "We Do Not Engage in Insider Trading or Related Unlawful

Conduct," the Code of Ethics states the following, in relevant part:

Employees and directors usually may buy or sell the publicly traded securities of FMC and other companies. However, U.S. law prohibits the buying and selling of publicly traded securities by a person with insider information. Even minor violations of the securities laws can have severe consequences. Penalties include forfeiture of gains, civil penalties of up to three times the profit gained or loss avoided, prison terms, and large fines.

Insider trading rules apply to all kinds of securities, including common and preferred stock, bonds, commercial paper, options, and warrants. They apply to direct buying and selling by the individual with knowledge and to tipping off a friend or family member who buys or sells. . . . .

FMC executive officers and directors are also prohibited from trading in FMC's publicly traded securities during any period in which participants in FMC's retirement plans could not engage in a similar type of transaction. Additional details on these restrictions are available through the General Counsel's office.

96.    In a section titled "We Report Suspected Non-Compliance," the Code of Ethics states the following:

Any employee who learns of a suspected violation of the Code must immediately report it by following the procedure below. Employees are required to come forward with any such information without regard to the identity or position of the suspected offender.

**FMC will treat the information in a confidential manner and will ensure that no acts of retribution or retaliation will be taken against anyone for making a report in good faith.**

**Non-Compliance Reporting Procedure**

- <u>Employee Report</u>: Any employee who learns of a violation of the Code must immediately report it.
- <u>Investigation</u>: It is FMC's policy and intent to investigate any reported violation of the Code, other FMC policy, or applicable law, and to take appropriate action, as determined by FMC, based on the results of the investigation. Reports of violations of accounting, accounting controls and audit matters will be investigated under the supervision of the Director of Internal Audit and the Audit Committee of the Board of Directors. All other violations will be investigated under the supervision of the Ethics Office. Employees are expected to cooperate in the investigation of reported violations.
- <u>Confidentiality</u>: Each investigation, all associated documents, and the identities of those involved (reporters, accused parties, investigators, participants, etc.) will be managed confidentially, securely, and on a need-to-know basis. Employees should be aware that the Ethics Office, Corporate Responsibility

Committee and Audit Committee are obligated to act in the best interests of FMC and do not act as personal representatives or lawyers for the employees.

- <u>Protection Against Retaliation</u>: Retaliation in any form against an individual, who in good faith reports a violation of the Code, even if the report is mistaken, or who assists in the investigation of a reported violation, is prohibited. **Every employee may report such violations without fear of retaliation by coworkers, supervisors or others that are the subject of the report.**

(Emphasis in original.)

97.    In violation of the Code of Ethics, the Individual Defendants (as key officers and/or as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## AUDIT COMMITTEE CHARTER

98.    The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following about the Audit Committee's main objectives:

The Audit Committee (the "Committee") of the Board of Directors (the "Board") of FMC Corporation (the "Company") shall assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's internal audit function and independent auditor and (4) the compliance by the Company with legal and regulatory requirements.

The Committee shall prepare the report required by the rules of the Securities and Exchange Commission (SEC) to be included in the Company's annual proxy report.

99.    Under a section titled "Authority, Duties and Responsibilities," the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

The Committee has authority to take appropriate actions necessary to discharge its duties and responsibilities, which includes but is not limited to the powers mentioned below. Among its specific authorities, duties, and responsibilities, the Committee shall:

A. <u>Review Procedures</u>

1.   Meet to review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in Management's Discussion and Analysis and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2.   Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including disclosures made in Management's Discussion Analysis, and the results of the independent auditor's review of the quarterly financial statements.

3.   In connection with the reviews of the Form 10-K's and Form 10-Q's above, review and discuss with management and the independent auditor the following matters, as applicable:

a. Significant issues regarding accounting principles, financial reporting, financial statement presentation, and judgments made in the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles;
b. Significant issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies;

c. The independent auditor's report on:

i. All critical accounting policies and practices to be used;

ii. Alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

iii. Other material written communication between the independent auditor and management, such as any management letter or schedule of unadjusted differences;

d. Matters required to be discussed by PCAOB Standard No. 1301 "Communications with Audit Committees" relating to the conduct of the audit, including any difficulties encountered in the course of the audit work,

and any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

e. Disclosures made to the Committee by the Company's CEO and CFO regarding compliance with their certification obligations as required under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, including the Company's disclosure controls and procedures and internal controls over financial reporting and evaluations thereof.

f. The effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the Company's financial statements.

4. Discuss with management the Company's policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and risks related to cyber security; steps management has taken to monitor and control such exposures; and significant estimates affecting the Company's financial statements, such as litigation, tax, and environmental matters.

5. Review with management the Company's earnings press releases, including the use of "pro-forma" or "non-GAAP" information, as well as information and earnings guidance provided to analysts and ratings agencies. Such discussions may be done generally, consisting of discussing the types of information to be disclosed and the types of presentations to be made.

6. Periodically review and discuss with management and internal audit the integrity of Environment, Social and Governance (ESG) reporting metrics included in public filings with the SEC, as well as the related controls, risk exposures, and disclosures.

B. Independent Auditors

1. Have sole authority to appoint or replace the independent auditor, subject to shareholder ratification. The independent auditor shall report directly to the Committee.

2. Be directly responsible for the compensation and oversight of the work of the independent auditors, including the resolution of disagreements between management and the independent auditor regarding accounting and financial reporting, for the purpose of preparing or issuing an audit report or related work.

3. Pre-approve all audit and permitted non-audit services to be performed for the Company by the independent auditor, as described in the Audit Committee PreApproval Policy.

4. Obtain and review a report from the independent auditor at least annually regarding the following:

a. The independent auditor's internal quality-control procedures;

b. Material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm;

c. Steps taken to deal with any such issues;

d. All relationships between the independent auditor and the Company.

5. Evaluate the qualifications, performance and independence of the independent auditor, including considering whether the provision of permitted non-audit services is compatible with maintaining the auditor's independence, taking into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent auditor to the Board.

6. Review and evaluate the lead partner of the independent audit team. Ensure the rotation of the lead audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit, as required by law. Consider whether, in order to assure continuing auditor independence, it is appropriate to adopt a policy of rotating the independent auditing firm on a regular basis.

7. Establish and review policies for the Company's hiring of employees or former employees of the independent auditor who participated in any capacity in the audit of the Company.

8. Discuss with the independent auditor any communications between the audit team and the audit firm's national office respecting auditing and accounting issues presented by management.

9. Discuss with the independent auditor the annual audit plan, including scope, staffing, locations to visit, key risk areas, and general audit approach.

10. Discuss with the independent auditor and internal auditors the effectiveness of the Company's finance and accounting organization.

11. Review reports issued by the independent auditor on greenhouse gas emissions or other ESG metrics as part of required independent third-party assurance.

C. Internal Audit Department

1. Discuss the internal audit plan with the chief audit executive, including the scope, budget and qualifications of the internal audit staff, as deemed necessary.

2. Approve the appointment, performance and replacement of the chief audit executive.

3. Review significant internal audit findings with the chief audit executive, along with management's responses and follow-up to the findings, together with explanations for any significant deviations from the original plan.

D. Compliance and Other Matters

1. Review annually the travel and entertainment expenses of the Chairperson and President, and a summary of all other corporate officers' travel and entertainment expenses.

2. Review and discuss any reports from the Corporate Responsibility Committee, management, internal auditors, and independent auditor regarding the Company's (including its subsidiary/foreign affiliated entities) conformity with applicable legal requirements and the Company's Code of Ethics and Business Conduct Guidelines.

3. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

4. Establish and review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

5. Conduct or authorize investigations into any matters within the Committee's scope of responsibilities. For that purpose, the Committee shall be empowered to retain independent counsel, accountants, or other advisors to assist in the conduct of such investigations and shall advise the Board as to the nature and extent of such investigations. The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent auditor for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

100.    In violation of the Audit Committee Charter, the Individual Defendants failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

101.    FMC is a Delaware corporation that holds itself out to be "a global agricultural sciences company" and "the fifth largest global innovator in the agrochemicals/crop protection market." The Company focuses on the development and commercialization of so-called crop protection products. Such crop protection products include insecticides, herbicides, fungicides and seed treatments. Two of the Company's largest revenue-generating products are two diamide-class insecticides, Rynaxypyr and Cyazypyr, which had approximate revenues of $1.0 billion and $500 million in 2024, respectively. During the Relevant Period, these two insecticides cumulatively accounted for approximately 40 percent of the Company's total revenues.

102.    The Company sells its products, including Rynaxypyr and Cyazypyr, to a combination of retailers, but primarily sells directly to authorized distributors. These distributors, in turn, sell the Company's products to retailers, who ultimately sell FMC products to farmers and other end-users. The Company maintains long-standing relationships with many of its distributors, some of whom the Company has worked with for over twenty-five years and with whom the Company has pre-payment agreements to guarantee continuous supplies of inventory. This provides the Company, in turn, with relatively extensive insight into the inventory levels maintained by its distributors. These distributors, and FMC's business operations more generally, may be described as occurring within four regions, North America, LATAM, APAC, and EMEA.

103.    Key to the Company's financial metrics are Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA"), Free Cash Flow ("FCF"), and leverage ratio. Of these metrics, the Company's leverage ratio is of particular importance because FMC relied, in no small part, upon debt to finance its operations.

104.    To secure financing, FMC entered into several credit agreements that required the Company to maintain specific leverage ratios or face default. On May 26, 2021, the Company entered into a Fourth Amended and Restated Credit Agreement (the "Fourth Credit Agreement"), which provided for a "$1.5 billion revolving credit facility . . . with an option, subject to certain conditions and limitations, to increase the aggregate amount of the revolving credit commitments to $2.25 billion," and which required the Company to maintain a leverage ratio of not more than 3.75:1.00 at the end of each fiscal quarter until September 30, 2021. Thereafter, the Company was required to maintain a leverage ratio of 3.50:1.00.

105.    On June 17, 2022, FMC entered into a Fifth Amended and Restated Credit Agreement (the "Fifth Credit Agreement"), which provided for a $2.0 billion to $2.75 billion revolving credit facility. The Fifth Credit Agreement required FMC to maintain a leverage ratio of not more than 3.50:1.00.

106.    FMC implemented and maintained an SAP program for Enterprise Resource Planning ("ERP"), which provided Company-wide access to all facets of the Company's business. FE-8 characterized this SAP ERP as "cutting edge," because it provided "instant access to information," pertaining to, *inter alia*, sales, forecasting, inventory, and pricing across FMC's global operations.

### *Acquisition of Rynaxypyr and Cyazypyr*

107.    In 2017, the Company acquired two diamide insecticides, Rynaxypyr and Cyazypyr, from DuPont for $1.2 billion. The Company and the Individual Defendants hailed this acquisition as transformative, with the potential to generate billions in worldwide revenues and position the Company among the world's largest agricultural companies. This acquisition included several patents related to these insecticides, including: (1) Composition of Matter Patents, which

"[p]rotect[ed] [the] proprietary molecular structure of the active ingredient and the molecular structure of certain intermediates"; (ii) Process Patents, which "[p]rotect[ed] the manufacturing processes for the active ingredient and the key intermediates used to make the active ingredient"; (iii) Formulation patents, which "[p]rotect[ed] product formulations that use[d] the active ingredient"; (iv) Use Patents, which "[p]rotect[ed] how a product containing the active ingredient [was] used"; and (v) Application Patents, which "[p]rotect[ed] the methods or approaches to apply products containing the active ingredient." The Company also represented that global regulation would offer the Company further protection for intellectual property pertaining to these products.

108.    The Company announced this acquisition in a March 31, 2017 press release; during an investor conference that day, Defendant Brondeau stated that:

> This acquisition will significantly expand our commercial portfolio, including the market-leading insecticide Rynaxypyr and Cyazypyr . . . .
>
> **We believe Rynaxypyr is the single-largest IP-protected crop protection molecule on the market today. . . . .**
>
> **This is a pivotal transaction for FMC as it transforms the company into a Tier 1, innovation-based crop protection company, the fifth largest in the world, by revenue, once all the current consolidation is complete.** But this transaction is not exciting simply because it increases our size. **We are equally excited that we're acquiring a portfolio of market-leading products and a work-class R&D organization. Together, the performance of our Ag Solutions business will be transformed in both the near and long term.**
>
> (Emphasis added.)

### *Demand Collapses*

109.    During the Pandemic, the Company experienced heightened demand as distributors, retailers, and consumers, fearing supply chain disruptions, stockpiled excess inventories. FE-1 recalled distributors procuring "huge volumes" of "excess" inventory in 2021 and early 2022. FE-1 further recounted that the Company failed to account for future losses

resulting from excess inventory, which would ultimately lead to reduced sales in future periods. FE-1 stated that by mid-2022, FMC was already beginning to see substantial margin decline. FE-1 further stated that FMC customers began negotiating the return of excess inventory and attempting to renegotiate the agreed-upon prices paid therefor, in consideration for continuing to purchase FMC products. FE-6 described activity during the Pandemic purchasing surge as a "bubble," and FE-6 stated a belief that FMC executives were misleading the public as to the sustainability of such revenues.

110.    FE-4, describing the period of heightened purchasing, stated that everyone at the Company "always knew that [FMC] would hit a wall." FE-4 further stated that despite this knowledge that the heightened demand was a fleeting consequence of the Pandemic, the Individual Defendants failed to adjust the Company's revenue forecasts for the following years. This was despite the fact that, according to FE-4, a decline in demand for the Company's products was "imminent" by Spring 2022. FE-10 recalled advising his Regional Business Manager that the sales targets given him for 2021 and 2022 were infeasible because "barns were full and product had not hit the ground."

111.    The Company's inventory issues were confirmed as well by FE-9, who characterized sales during the Pandemic as "unnatural." According to FE-9, distributors, retailers, and farmers began making duplicate orders at this time, placing the same order from up to five different sources in the hope that a single order would actually be fulfilled. According to FE-9, all such orders were counted as sales, but when a customer received the product it sought from one channel, such transaction would cancel the duplicate orders. FMC leadership, according to FE-9, became aware of this trend through, *inter alia*, communication with distributors, direct

communication with divisional directors, access to the Company's SAP ERP, and other internal reporting.

112.    FE-2 and FE-3 confirmed that the Company's management continued to increase sales targets after the Pandemic despite having knowledge that channel inventory was oversaturated. FE-3 specifically recalled reacting to these sales targets by wondering "how on earth [FMC employees were] supposed to be selling that much when the channels were already full." FE-3 stated that the Company maintained unrealistic sales targets across all its regions. FE-6 recalled that after FMC management raised sales targets by 10% or more in 2021 over the prior year's inflated sales figures, many veteran members of the Pakistani sales team left the Company out of frustration with the new sales targets.

113.    At this time, FE-16 stated that the Company was attempting to incentivize distributors by offering deals with "no cash needed." FE-16 estimated FMC had lost between $50 and $60 million due to this practice and further stated specifically that Defendants Douglas and Sandifer were aware that pushing higher sales despite saturated channels was adversely impacting FMC's business. FE-4 stated that this practice of "shov[ing] products into the channel" to meet sales targets was promulgated by executive leadership, including Defendant Douglas.

114.    According to FE-19, these inventory issues were exacerbated by an anticipated, and significant, increase in the price of FMC's products, which the Company had told customers was slated for December of 2022. FE-19 explained that this served to generate additional excess inventory accumulation and consequent downward demand pressure for FMC's products in 2023.

115.    During and after 2022, other market factors also contributed to excess inventory accumulation at the Company, including an increase in generics competition for FMC products—most notably, its diamide insecticides. By mid-to-late 2022, the Company had begun experiencing

significant and undisclosed legal setbacks that harmed its ability to maintain patent exclusivity for these diamide products. Prominently, China's National Intellectual Property Administration ("CNIPA") ruled that the Company's process patent for an intermediate chemical used in producing Rynaxypyr was unenforceable. On September 16, 2022, a Brazilian court ordered three Brazilian agencies to conduct regulatory assessments of a generic competitor for Rynaxypyr, produced by Rainbow Agro, that were required prior to its marketing and sale in Brazil. Brazil is the largest market in the Company's LATAM region.

116.    Subsequently, on September 19, 2022, the Delhi High Court in India ruled against FMC in litigation with Natco Pharma ("Natco"), a competitor seeking to manufacture a generic version of Rynaxypyr, and vacated an injunction FMC had previously obtained against Natco. Natco shortly announced it was launching Natgen, a generic substitute for Rynaxypyr, in the Indian Market. The Delhi High Court denied FMC's appeal of its September 19, 2022 decision on December 5, 2022. The Delhi High Court again ruled against FMC on November 14, 2022, allowing GSP Crop Science ("GSP") to market a Rynaxypyr competitor in India, thus paving the way for subsequent lawful generic competition. In its ruling, the Delhi High Court described FMC's litigation strategy as "nothing but an attempt by the Plaintiffs to extend their monopoly."

117.    FE-1 recalled the subsequent influx of generic competitors for the Company's diamide products in multiple key markets as early as 2021 or 2022. FE-1 stated that marketing teams for FMC's distributors attributed reduced orders of FMC products to excess inventories as well as a rise in generic competitors available at significantly lower price points than FMC's products. FE-7 stated that generic competitors had become prevalent in Pakistan, India, and Europe. Moreover, according to FE-7, the Company's business in China had been reduced as result of generic competition by as much as 50%.

118.    FE-10, meanwhile, recalled generic substitutes for Company products appearing in the United States as well. These products included Steward and Indoxacarb, with which, FE-10 recalled, FMC was unable to compete. FE-10 stated that a colleague in Oklahoma explained that retailers had begun selling generic competitors available for roughly half the price of the Company's products.

119.    FE-12 stated that Company did implement initiatives to decrease the production costs of its diamide products in order to become competitive with generics in the Indian and Chinese markets. FE-12 stated that the claims that FMC had a strong patent portfolio globally were "overstated" because FMC's patents were particularly vulnerable in some countries. FE-4 echoed this sentiment, recalling that discussions regarding the Company's concerns for its process patents were taking place at FMC by early 2022. FE-4 described the Company's banking on its process patents as "kind of a long shot." FE-2 explained that the sale of generic competitors spread in China, since once a product can be registered as a generic in one country, the same can lawfully be done in some other places, such as Pakistan. Consequently, FE-2 stated, companies began testing generic alternatives to diamide products in Pakistan in 2019 or 2020, and by mid-2022, many of these generic competitor products became registered for sale.

120.    Additionally, the Company's sales were harmed by industry consolidation between 2021 and 2022 among FMC's distributors. FE-10 explained that the consolidated national distributors began favoring crop protection products offered by FMC's competitors because their herbicides and pesticides could be bundled with other products and sold at a discount. For instance, whereas FMC only sold crop protection solutions, its competitors like Corteva, Syngenta, and Bayer also sold seed offerings, which could be bundled with crop protection products in sales to distributors. These consolidated distributors were actively acquiring retailers as well, and many of

the distributors began marketing generic versions of the Company's products as their own. This gave these distributors additional economic incentives and the ability to push products to retail that out-competed FMC's. However, FE-10 stated, even though demand and revenue issues continued throughout the Relevant Period, **"*no one had the gumption to tell the investors that the party was over*"** (emphasis added).

121.    Finally, FE-6 stated that revenue declines continued because of customer dissatisfaction related to the expiration of many of the products purchased during the Pandemic, including the diamide insecticides.

122.    Thus, in 2023, FE-9 stated, the sales figures being reported by FMC were significantly overstated. FE-9 recalled that as early as mid-2022, it became clear that the Company was struggling financially. FE-4 recalled the Company cutting its advertising budget and beginning layoffs in mid-2022. Similarly, FE-10 recalled the Company inducing employees to take voluntary separation in the fall of 2023 by threatening layoffs, and FE-9 recounted the Company offering early retirement options in 2023.

### Individual Defendants' Knowledge of FMC's Declining Demand

123.    Several former employees explained that detailed information concerning the Company's demand, channel inventories, revenues, margins, and pricing was widely accessible throughout the Company and flowed up from the regional level to Company management in the United States.

124.    FE-1 recalled participating in Supply and Operations ("SOP") meetings, during which the Company's sales, distribution channels, demand, and inventories were discussed. Per FE-1, through mid-2022, at least, LATAM SOP meetings occurred monthly, and company-wide SOP meetings occurred biannually. FE-1 explained that the Company's senior regional executives

attended these monthly SOP meetings, including LATAM President Defendant Pereira and LATAM CFO William Mills.

125.    Similarly, FE-19 reported that through mid-2023, there were monthly SOP meetings in the EMEA region, at which the Vice President for Europe, finance managers, demand managers, and supply chain managers, among others, were present. FE-19 also stated that Defendant Douglas participated in monthly Executive Sales and Operations Planning ("ESOP") meetings along with all of the Company's Vice Presidents. FE-19 explained that, during September of each year, sales numbers were presented as part of a budget presentation by the VP of Europe to Defendant Douglas and Defendant Sandifer.

126.    FE-3 recalled monthly Demand Planning meetings in FMC's EMEA region, where personnel from numerous Company departments were present. FMC's demand plans accounted for information regarding demand for FMC products, inventories in distribution channels, and supply issues. According to FE-3, following the monthly EMEA Demand Planning meetings, the European Head would then meet with Defendant Douglas.

127.    FE-4 recalled "All Hands" meetings at FMC's Philadelphia, Pennsylvania headquarters approximately one month after the end of each fiscal quarter. FE-4 explained that Defendant Douglas led these meetings, and that they included discussion of topics including the Company's quarterly performance, inventory levels, sustainability, and market factors impacting FMC's business.

128.    FE-16 stated that he learned about FMC's inventory issues in Brazil at "Town Hall" meetings, at which Defendants Douglas and Sandifer spoke. Despite discussions of the Company's inventory issues, FE-16 recalled Company management touting how much its business was growing during these meetings. FE-16 stated that he "laughed about the numbers the Company put

out" in these meetings, and noted that "no one" in his position "believed anything they said in the Town Hall meetings because they were not accurate numbers at all."

129.    FE-11 stated that LATAM CFO William Mills and other regional leaders reported deterioration in product pricing up to Defendants Douglas and Sandifer on a quarterly basis. FE-1 further explained that through at least mid-2022, the Company was able to monitor distributors' inventory levels, as FMC had employees tracking monthly inventory levels, and FMC's distributors either had computer systems that were integrated with FMC's systems or sent inventory reports to the Company.

130.    Furthermore, FE-9 and FE-10 explained that the Company's SAP ERP system contained detailed information regarding distributor orders, and FE-9 stated that the Company utilized Point of Service reports, in which retailers reported inventory information to FMC.

131.    Former employees further detailed the use of Electronic Distribution Invoice ("EDI") reports by FMC, which contained detailed information pertaining to the supply chain of the Company's products, from distributor to retailer. FE-9 confirms that EDI information was reported to FMC Corporate.

**False and Misleading Statements**

***February 8, 2022 Form 8-K***

132.    On February 8, 2022, the Company issued a press release, which it also filed on Form 8-K with the SEC, disclosing that its purported "record quarterly results" were driven by "***strong demand*** and pricing actions." (emphasis added). The release further touted "new products and continued market expansion of Rynaxypyr and Cyazypyr," and quoted Defendant Douglas as stating that FMC's financial results reflected "the strength of [FMC's] synthetic and biological portfolios, ***a healthy demand environment*** as well as accelerating price increases." (emphasis

added). The press release also quoted Defendant Douglas as stating that "[r]evenue growth was particularly robust in North America and Latin America.

### February 9, 2022 Earnings Call

133.    On February 9, 2022, the Company hosted an earnings call to discuss its financial results for the fourth quarter of 2021. During the call, Defendant Douglas stated that FMC's "***Asia business is expected to grow across several countries driven by diamides***, new products and biologicals" (emphasis added). Defendant Douglas further stated that "***India will continue to be an important market for our diamides*** as well as the broader portfolio, especially in sugarcane, rice and specialty crops." (emphasis added).

134.    Later on the call, in responding to a question regarding channel inventories, Defendant Douglas emphazied that "[f]rom a volume perspective . . . there's obviously—***there's very, very strong demand out there***" (emphasis added). Defendant Douglas then continued to state the following, in relevant part:

> I think ***from a market demand perspective, it's very strong all over the world. I mean when I think about channel inventories today, frankly, I have very, very few concerns from where I sit at FMC.*** There are pockets in India following the spotty monsoon that we had last year, but they're not significant. ***Brazil, we have— from FMC's perspective, we got absolutely 0 concern.*** From North America and probably the other way around when it comes to channel inventories, I'm more concerned that there is not enough material there. Europe, not really a problem at all. ***So channel inventories, frankly, in our own internal conversations has not really come up much in the last quarter. Demand has come up. Demand is very, very strong.***

(Emphasis added.)

135.    Later during the same earnings call, in response to a question about FMC's expectations for growth, particularly with respect to diamide products, Defendant Douglas stated, in relevant part:

I think what is most pleasing for us is we see the diamides continuing to grow in that mid- to high single-digits depending on the year, that keeps rolling through. We see that year in, year out since we acquired the products.

***February 25, 2022 Form 10-K***

136.    On February 25, 2022, the Company filed its Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K, which was signed by Defendants Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Greer, Johnson, Kempthorne, Norris, Øvrum, Pallash, and Volpe, purported to warn investors of the risks related to competition. In relevant part, it stated:

> ***Our business faces competition, which could affect our ability to maintain or raise prices, successfully enter certain markets or retain our market position. Competition for our business includes not only generic suppliers of the same pesticidal active ingredients*** *but also alternative proprietary pesticide chemistries and crop protection technologies that are bred into or applied onto seeds.* ***Increased generic presence in agricultural chemical markets has been driven by the number of significant product patents and product data protections that have expired in the last decade, and this trend is expected to continue. . . . At this time, the scope and potential impact of these technologies are largely unknown*** *but* could have the potential to disrupt our business.

(Emphasis added.)

137.    This generic risk disclosure was materially misleading because it represented as hypothetical a risk that had already materialized. Specifically, competition was already affecting the Company's "ability to maintain or raise prices" or to "retain [] market position."

138.    The 2021 10-K additionally contained the following misleading risk disclosures regarding FMC's ability to guard its intellectual property:

> Our future performance will depend on our ability to address active ingredient composition of matter patent expirations through effective enforcement of our patents that continue to cover key chemical intermediates and process patents, as well as portfolio life cycle management, particularly for our high value diamide insecticides . . . ***Some of our competitors may secure patents on production methods or uses of products that may limit our ability to compete cost-effectively***
>
> . . . . .

The ***composition of matter patents on our Rynaxypyr® active ingredient is nearing its expiration in several key countries. We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents. . . . Other third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents due to the risks inherent in any litigation. . . . . We are currently and may in the future be a party to various lawsuits or administrative proceedings involving our patents.*** (See "Patents, Trademarks and Licenses" in Item 1.). Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. ***In such circumstances, an adverse patent enforcement decision which could lead to the entry of competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results.***

(Emphasis added.)

***Remarks at the RBC Capital Markets Chemicals and Packaging Conference***

139.    On March 8, 2022, the Company participated in the RBC Capital Markets Chemicals and Packaging Conference. At this event, Defendant Douglas represented that "[c]hannel inventories for us are normal, if not low in some parts of Latin America." Defendant Douglas continued, stating:

***We've had very strong demand. A lot of that demand was used during the season, which is always a very good sign.*** So I think with soft commodity prices as they are, you're going to see that trend pretty much everywhere in the world where products are getting used to make sure that the growers are getting the highest yields they possibly can. When you have record prices for soy, corn, wheat and you name your crop, cotton, sugar, they're all up there. People really want to protect those crops. ***So we see that demand side being very strong.***

(Emphasis added.)

***May 3, 2022 Form 10-Q***

140.    On May 3, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for its first fiscal quarter of 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q incorporated by

reference the materially misleading risk disclosures regarding increased competition and FMC's ability to protect its intellectual property that were contained in the 2021 10-K.

### May 3, 2022 Earnings Call

141.    Also on May 3, 2022, the Company held an earnings call with analysts and investors to discuss its financial results for the first quarter of 2022. During this call, Defendant Douglas was asked about FMC's channel inventories and the "good amount of prebuying in a lot of different regions ahead of maybe an expectation of additional price increases, concerns around supply chain." Defendant Douglas responded, stating, in relevant part:

> **Generally speaking, we are not concerned about channel inventories. There are a couple of pockets in the world. One we alluded to, which is India.** In Q4, weather patterns were not great, and there is a reduction in rice acres in India, and you saw some of the comments about strong growth in ASEAN and Australia offset by India. **We're taking the opportunity to reduce our channel inventories in India at the beginning of the year. We expect that to normalize pretty quickly as we go through the first half year. Outside of that, Northern Hemisphere, I don't think we'll carry in excess inventories as we're going into the channel into the seasons.**
>                                        * * *
> **So we're not seeing anything that we would say is concerning at all. They seem pretty normal to us. In Latin America, for us, normal. Argentina, Brazil, Mexico, India where we should be at this point of the season, demand has been very good for us.** Our growth rates are in line with how we're penetrating the market. You'll recall on the call here, I just talked about the fact that we've been spending a lot of time and effort improving our market access into the soy complex in Brazil, and that's where our growth is coming from, whether it be with insecticides or some of the new herbicides that we have in place. **We're not worried about where our inventory levels are at all in Brazil or Argentina.**

(Emphasis added.)

142.    During this same earnings call, Defendant Douglas was asked by Laurent Guy Favre of BNP Paribas "if you could talk a little bit about, I guess, volumes including mix, so really intensity of use. Are there reasons why you would not expect a higher intensity of use . . .[?]" Defendant Douglas responded:

*[O]ur backdrop is positive. [W]e believe markets will continue like this, certainly this year and probably into next year as well. We don't see anything on the horizon that will change that.* So from our perspective, it is making sure that we can get those high-quality, newer technologies to the marketplace, certainly in the right time frame given all the disruptions we're seeing.

(Emphasis added.)

***May 4, 2022, Wells Fargo Industrials Conference Remarks***

143.   On May 4, 2022, the Company participated in the Wells Fargo Industrials Conference. During the conference, in response to a question regarding demand for FMC's products in the United States, Defendant Sandifer stated:

*The U.S.—look, the U.S. market is still going gangbusters. We'll see how planning continues to proceed in early season, but it's been a good start to the season. We had very robust sales growth in both Canada and the United States in the first quarter,* and it is one place that I would know we definitely saw some advanced purchasing, all within the season for products that should be used within this growing season, but that blurring between Q2 and Q1.

(Emphasis added.)

144.   Additionally, Despite recognizing that demand was abnormal for the season, Defendant Sandifer stated that FMC expected to sustain that level of demand "for several years," stating:

Certainly, there were heightened concerns among retailers, distributors and growers on availability of materials. So we did see some early plays in the orders, and quite honestly, we had a very, very strong Q1. We could have sold more, but we ended up with more demand particularly for products that aren't quite -- it's not quite the time for them to usually be consumed that we weren't prepared to produce just yet. That demand has been very, very strong. *We see those conditions continuing. . . . And we see a pretty good market in the U.S., not only for this year but for several years.*

(Emphasis added.)

***BMO Capital Markets Global Farm to Market Conference Remarks***

145.    On May 18, 2022, the Company attended the BMO Capital Markets Global Farm to Market Conference (the "2022 BMO Conference"), at which, in response to a question regarding the Company's channel inventory position, Defendant Douglas stated that:

> *[I]nventories are where they should be right now.* We had a very -- FMC had a very strong Q1, but we know some of that came from Q2 because people are just concerned about supply. Rightly so with what's happening in the chemical industry and the broader industry in general. *I think inventories are in good shape. The only one we highlighted at our February call, which we're working through now, is parts of India. There was less rice acres given the seasonal weather*, the monsoon in Q4. *So we had more inventory as FMC, and I'm sure others did as well, but everywhere else is in pretty good shape.*

(Emphasis added.)

146.    Later during the 2022 BMO Conference, in response to a question by an analyst as to what the Company was doing to gain visibility into inventory in Brazil, which it had previously lacked, Defendant Douglas stated that "[t]oday, we have a system that is very different. We manage inventory not only in our own facilities, not only in third-party warehouses but also at the grower level." He concluded by adding that *"right now, as I said earlier, there are no issues with inventory in Brazil for us"* (emphasis added). In relevant part, Defendant Douglas stated:

> Today, we have a system that is very different. We manage inventory not only in our own facilities, not only in third-party warehouses but also at the grower level. So our sales force and our financial groups are actually lockstep in terms of how much product are we selling into the market? How much is actually getting through to the grower? And then importantly, how much is getting used on the ground? So the system is completely different to what it was 7, 8, 9 years ago in terms of how we manage inventory in Brazil.

147.    Later, when asked by an analyst about FMC's EBITDA and revenue targets, Defendant Douglas responded the following, in relevant part:

> *I mean we put our plan together back in 2018 after we acquired the DuPont assets, and we had really an algorithm that said 5% to 7% top line growth, 7% to 9% EBITDA growth and then EPS growing faster than EBITDA. We're generally on -- we're right the range for revenue.* We're slightly below in terms of EBITDA, but we've had $1 billion of costs and FX that we didn't have in the

plan. ***So I feel very good where the company is.*** I think this year, we're at 6% EBITDA growth. So we're right at the range. It's a very attractive algorithm. When you think of a company like us, $5.5 billion in revenue, $1.4 billion in EBITDA, we're in a $65 billion market. We're a research company. We're applying 6% to 7% of our revenue into that model for R&D. You should be growing your EBITDA faster. And we have been. ***So I think that model is very much intact.***

(Emphasis added.)

148.    Later during the 2022 BMO Conference, Defendant Douglas boasted of FMC's "very strong demand," stating:

We're managing through a very volatile environment. We all know that. That will change as we go through the rest of the year and into next year, that should change. But ***the way the company is performing, dealing with all the activities that are out there, very strong demand, pricing actions where we delivered 8% price in the quarter, roughly mid-single-digits for the full year to offset costs. I think the company is performing at a very high level.*** So we were surprised when we saw the stock go down. It's come back, not quite to the point that it was. But I think people are missing the fact that the company is performing at a high level. We have 26%, 27% EBITDA margins. There is nobody in the industry growing at 7% to 8% on the revenue line with those sort of EBITDA margins, despite the significant cost inflation that we've got.

(Emphasis added.)

149.    In the thirty-day period running February 22, 2022 (ten days prior to the Company's filing the Q1 2022 10-Q) to March 22, 2022 (18 days after Defendant Douglas's remarks at the 2022 BMO Conference), Defendants Brondeau, Douglas, and Sandifer conducted several lucrative insider sales.

150.    Defendant Brondeau conducted four insider sales between February 22, 2022, and February 24, 2022, selling a total of 29,779 shares for total proceeds of approximately $3,428,210.3

151.    Defendant Douglas conducted four insider sales between February 22, 2022, and February 24, 2022, selling a total of 7,257 shares for total proceeds of approximately $836,796.

152.    Defendant Sandifer conducted six insider sales between February 22, 2022, and March 4, 2022, selling a total of 9,115 shares for total proceeds of approximately $1,071,622.

153.    Thus, in total, in the thirty-day period running from February 22, 20222, through March 22, 2022, Defendants Brondeau, Douglas, and Sandifer sold 46,151 shares of Company common stock on insider information, for which they received an approximate $5.34 million in proceeds. Their insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate their motives in facilitating and participating in the scheme.

### August 3, 2022 Form 10-Q and Earnings Call

154.    On August 3, 2022, FMC filed a quarterly report on Form 10-Q with the SEC for its second fiscal quarter of 2022 (the "Q2 2022 10-Q"), which incorporated by reference the misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were contained in the 2021 10-K and the 1Q22 10-Q.

155.    The same day, the Company hosted an earnings call to discuss its financial results for the second fiscal quarter of 2022, during which Defendant Douglas responded to a question regarding the Company's inventory levels by stating:

> *We're very okay with inventory levels pretty much everywhere in the world right now.* I would say the only spot and I've commented on this at the last earnings call is there has been a significant reduction in rice acres in India. *And we're working through inventory in India. That will be done as we go through the second half of the year. Everywhere else, frankly speaking, is very good from our perspective on inventory. So we're not worried about that going into the end of the year.*

(Emphasis added.)

156.    During this earnings call, Defendant Douglas also replied to a question regarding revenue streams from FMC's diamide pesticides as compared to those of its third-party partners

by stating that 60% of the revenue came from FMC-branded products. Defendant Douglas continued by stating:

> I think the most important takeaway that you should take away from this conversation is the 40% as it grows, does not take away from the 60% as we grow. ***It's an expansion of the market pool for the diamides . . . we see the diamides taking share from a number of older chemistries, whether they be neonicotinoids, some of the pyrethroids, and certainly some of the [carbonates] around the world.***

(Emphasis added.)

***November 1, 2022 Form 8-K and November 2, 2022 Earnings Call***

157.    On November 1, 2022, the Company issued a press release, which it also filed on Form 8-K with the SEC, reporting FMC's financial results for the third quarter of 2022. In the press release, Defendant Douglas was quoted as stating that "***FMC's strong growth continued in the third quarter driven by a robust start to the Latin American season*** and continued pricing actions across all regions" (emphasis added). Regarding the Company's LATAM segment, the Company reported that regional sales "grew 35 percent year-over-year **driven by strong herbicide and insecticide demand**" and that, "***In Brazil, FMC is reaping the benefits of investing in expanding market access for its products***" (emphasis added).

158.    On November 2, 2022, during the Company's third quarter 2022 earnings call, Defendant Douglas represented that "***demand remains strong for new products based on the diamides and other chemistries***, and FMC continues to make significant progress by improving our market access in geographies where we are underrepresented" (emphasis added). Defendant Douglas continued, stating:

> Pricing momentum and volume growth are expected to more than offset FX headwinds in the quarter. We have good visibility into demand for the quarter with ***strong order books for both the Brazilian and US markets.*** Cost increases are forecasted to be lower in Q4 compared to Q3. ***The combination of sales growth and lower cost headwinds is anticipated to result in EBITDA growth of 15% at the midpoint*** with EPS up 9% at the midpoint year- over-year.

(Emphasis added.)

159.    Later, when asked by an analyst about growth rates for the Diamide Products, Defendant Douglas stated "[t]his year, year-to-date, we're up in the high mid-single digits. ***We would expect that same growth rate next year as we go forward. We're getting new registrations, especially for Cyazypyr. That market is growing rapidly in many parts of the world, which is good news.***" (emphasis added).

160.    Also during this earnings call, Defendant Douglas was asked about FMC's inventory levels. In response, Defendant Douglas represented that there were mere "pockets" of higher inventories, rather than it being an issue that impacted the Company across all of its regions. Defendant Douglas attributed the "pockets" of higher inventories to weather conditions and maintained that "generally speaking, overall, we would say we're happy where inventory levels are." He continued:

> ***Well, I think generally speaking, overall, we would say we're happy where inventory levels are in the marketplace.*** There are pockets of higher inventories. We talked about India before. The last few years, with the weather monsoons played out and rice acreage reductions, have not been great. So we're working through inventory there.
>
> ***I would say in the U.S., things are fine.*** Europe is pretty okay for us. 1 or 2 pockets in the South because of the dry weather that we had last year. ***I would say in Latin America, there are parts of Brazilian market where they had a drought last year that you can imagine inventories are high. Inventories are high right now in Brazil because we're in the planting season. But we're happy with where our inventories are right now.***

(Emphasis added.)

***November 2, 2022 Form 10-Q***

161.    Also on November 2, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for its third fiscal quarter of 2022 (the "Q3 2022 10-Q"), which included a misleading

risk disclosure about the Company's ability to protect its intellectual property. The Q3 2022 10-Q specifically stated, with respect to FMC's patent litigation in China, that "we do not believe that the China Patent Review Board's decisions would materially adversely impact our enforcement of similar patents in other countries":

> ***The composition of matter patents on our Rynaxypyr® active ingredient are nearing their expiration in several key countries. We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents****. . . .* We intend to strategically and vigorously enforce our patents and other forms of intellectual property and have done so already against several third parties. ***Other third parties may seek to enter markets with infringing products or may find alternative production methods that avoid infringement or we may not be successful in litigating to enforce our patents due to the risks inherent in any litigation. . . . We are currently and may in the future be a party to various lawsuits or administrative proceedings involving our patents.*** Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. Two such proceedings in China are currently on appeal. . . . ***In such circumstances, an adverse patent enforcement decision which could lead to the entry of competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results****. . . . .*
>
> As noted in our 2021 Form 10-K, in early 2022, we received notice that certain third parties were seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals. Under Chinese law, the patents remain valid but are not enforceable pending appeal. ***Given the unique and specific Chinese patent law issues at issue in that situation, we do not believe that the China Patent Review Board's decisions would materially adversely impact our enforcement of similar patents in other countries.***
>
> The composition of matter patent that covers chlorantraniliprole (also known as Rynaxypyr® active) expired in a number of countries in August 2022; this patent will continue to remain in force in other countries throughout the world, expiring on a country-by-country basis at various dates through 2027. As described in our 2021 Form 10-K, ***we are deploying a multi-pronged strategy to defend that business after active ingredient patent expiration, including enforcement of our patents in many countries which continue to cover chemical intermediates and***

> *manufacturing processes that are essential in the production of chlorantraniliprole.*

(Emphasis added.)

162.    The Q3 2022 10-Q also incorporated by reference the misleading risk disclosure related to increased competition that was included in the 2021 10-K and FMC's previously filed quarterly reports.

### *Morgan Stanley Global Chemicals, Agriculture and Packaging Conference*

163.    On November 8, 2022, at the Morgan Stanley Global Chemicals, Agriculture and Packaging Conference (the "MSGCAP Conference"), Defendant Sandifer stated the following, in relevant part:

> We're also growing really rapidly. At the midpoint of our guidance for the full year, we're growing 13% in sales. We raised our guidance $100 million for revenue for the full year for essentially for the fourth quarter. . . . Similarly, as we've discussed, *we're expecting a pretty robust demand environment going into next year*. So we're actually building inventory slightly in addition to dealing with just the inflationary impact on inventory values. *But we're actually building and maintaining inventory despite the higher sales so that we're well prepared to go into Q1 and early Q2 with material.*

(Emphasis added.)

164.    As to the Company's ability to meet its long-term growth targets, Defendant Sandifer stated the following:

> We sketched out -- we're going into the fifth year of our 5-year plan, the 5-year strategic plan we launched in 2018 after digesting the acquisition of the DuPont assets. First time in my career in the chemical industry, we've made it to the 5th year of a 5-year plan. So I think that says something about the strength of the platform despite all the volatility that we've seen in the world in the last several years. *But we're very excited about the ability to continue growing at a market -- above market level. So we could use that same range at 5% to 7% top-line growth as a guidepost, which would be a significant premium to the overall market. And that's driven by both volume and pricing.* . . . . I think from a profit perspective, we're also very optimistic and particularly looking to return to our expectations of the bottom line growing substantially faster than the top line. *In our long-range plan, we had this algorithm, if you will, of growing the top line 5% to 7% and*

*growing the bottom line 7% to 9%. And we think that's kind of a range that's well within reach for 2023 for the company.*

(Emphasis added.)

165.    On January 3, 2023, between MSGCAP Conference and the filing of the February 7, 2023 Form 8-K, Defendant Johnson sold 37 shares of Company common stock for total proceeds of approximately $4,618.

### February 7, 2023 Form 8-K

166.    On February 7, 2023, the Company issued a press release, which it also filed on Form 8-K with the SEC, reporting FMC's fourth quarter and full-year 2022 results (the "FY22 Release"). In the press release, FMC reported revenues of $5.8 billion, "reflecting 15 percent growth," Adjusted EBITDA of $1.407 billion, and Free Cash Flow of $514 million. The Company attributed its "record fourth quarter and full-year 2022 results" to "***robust volume and strong pricing.***" (emphasis added).

167.    The press release quoted Defendant Douglas, who touted that "FMC delivered record performance in the fourth quarter, ***driven by robust volume growth***, continued strong pricing actions as well as growth of new products" (emphasis added). Defendant Douglas also stated that "***North America delivered exceptional revenue growth, with Latin America and Europe, Middle East and Africa (EMEA) posting strong gains.***" (emphasis added). Defendant Douglas was also quoted in the press release as stating the following, in relevant part:

> Full-year results were driven by significant volume and price gains in every region. Our continued focus on new product development, commercial launches and market access investments delivered record results in 2022. More than $600 million in revenue was from new products introduced in the last five years, an increase of over 50 percent from the prior year, and approximately $100 million in revenue from launches in 2022.

168.    Regarding FMC's 2023 outlook, the FY22 Release stated that "full-year 2023 revenue is forecasted to be in the range of $6.08 billion to $6.22 billion, representing an increase of 6 percent at the midpoint versus 2022, ***driven by strong pricing in all regions and growth in volume driven by new launches and market access***" (emphasis added). The press release also represented that the "***2023 outlook reflects pricing momentum and robust demand***" (emphasis added).

169.    Finally, the FY22 Release quoted Defendant Douglas as stating the following:

> We anticipate a positive market backdrop for 2023 that will support our pricing actions ***as well as continued healthy demand for FMC's synthetic and biological product portfolios*** (emphasis added). . . . we will continue to closely manage our supply chain in 2023 to take advantage of any cost improvement opportunities while ensuring product availability for our customers.

***February 8, 2023 Earnings Call***

170.    On February 8, 2023, the Company held its fourth quarter 2022 earnings call. During the call, Defendant Douglas stated the following in response to a question regarding inventory levels in the U.S., Brazil, and Argentina:

> Yes. I think -- so ***from a North American perspective, U.S. in particular, I think channel inventories are a little bit elevated right now, but that's normal.*** I would say, as you enter the season, most of retail and distribution is stocked up for a very good year. When I think of inventory levels for FMC compared to our sales on a percent basis, we're about the same place we were the year before. So I think it's pretty normal.

> Brazil and Argentina, a different story. Forget the nonselective that we just talked about. I think because of the conditions that we saw in the south of ***Brazil and in Argentina, it was very dry in the fourth quarter. I have no doubt that there is elevated channel inventories in that area, would not be a surprise at all.***

> ***If I run around the rest of the world, Europe, South of Europe is high again because of hangover from the last season. Northern Europe is pretty much okay, I think. In Asia, we've talked about India in the past. The weather didn't help again in 2022. So we see high channel inventories in India, which we'll be working through. Parts of Indonesia are similar, somewhat high. Rest of Asia is good. So overall, it's pretty much what you would expect.***

(Emphasis added.)

171.    Later during the call, in response to a question regarding growth expectations for

its diamide insecticides over the next few years, Defendant Douglas stated:

> I think we've said in the past, sort of that mid-to high single digits is where we think it will pan out over time. I wouldn't change that view right now. ***We do continue to launch new diamide formulations around the world, and Cyazypyr is growing very nicely as we get the new registration. So I think the mid-to high single digit is a perfectly good range of legacy.***

(Emphasis added.)

***Citi Global Industrial Tech and Mobility Conference Remarks***

172.    On February 21, 2023, at the Citi Global Industrial Tech and Mobility Conference

(the "2023 Citi Conference"), Defendant Sandifer stated the following in response to a question

regarding "patent expirations on diamides ... and what [you can] do to extend a life":

> [J]ust to give you the big picture, the diamides, Rynaxypyr and Cyazypyr, we have 30 patent families include about 1,000 patents, both granted and applied for that cover [a] broad array of issues that protect the diamides. The one that gets the most initial focus is the composition of matter patents, is literally the patent on the molecule itself. Some of those patents have already started to expire for Rynaxypyr. In fact, in several countries, China, India and certain Eastern European countries, the patent for Rynaxypyr expired in 2022.
>
> Now, ***that's just one of a small part of the total layer of protections we have around these molecules.*** We also have patents on the manufacturing process to make Rynaxypyr and Cyazypyr. We have patents on the intermediates, the composition amount of patterns on the intermediate materials that are used in that process. So for example, for Rynaxypyr, it's a 16-stage synthesis process.
>
> Many of the intermediate steps and the chemicals that are produced there really have no other use than for making Rynaxypyr. We have patents on their composition of matter. We have patents on the process to make several of those as well. We also have patents on formulations on how that product is finally formulated to take to market. So we've had this broad set of patent protections. We are also provided some protection to the use of our regulatory data and the way registrations are managed in different countries. ***They give us protection that continues well until the end of this decade and, in some cases, a bit longer.***

And certainly, with -- speaking directly to Rynaxypyr, which has earlier expiration dates, Cyazypyr goes a little bit further. But as you pointed to, P.J., ***it's not just relying on the patents themselves. And obviously, we've been very aggressive in enforcing the patents. We have won cases for infringement in both China and India and continue to aggressively defend our patents.*** But we've also engaged partners and brought other people in the business ahead of any kind of patent expiration. We don't believe that in our industry, in crop protection, that there really is a patent cliff. It's more of a long plateau as you transition from being a fully-patented to a post-patented life.

(Emphasis added.)

173.    Later, while responding to a question regarding the Company's inventory levels,

Defendant Sandifer stated:

Yes. I mean, certainly, when we talk about inventories, a lot of the focus is on the inventory that's in the channel so downstream from us and our direct customers, whether that be distributors or retailers or growers depending on the market that we're in. Going around the world, let's say, ***we'll start with Latin America because I think you highlighted one of the hot points. There was a drought and very dry conditions in Southern Brazil and Argentina at the beginning of the growing season in October, November. Some acreage was pulled out of production. There is some lost volume there. So because of that, there is a bit of channel inventory, and something we're very conscious of and managing closely.*** I would say there has been improvement in precipitation over the past months. Some of that business is just lost. You're not going to pick it back up. Some of it may recover.

Rest of Brazil is actually in pretty good shape. So it's really the southern part of Brazil and Argentina that are the hotspot. When I look at the rest of the Americas, the U.S. market and Canada, Canada is still a little early. ***In the U.S. market, there is a lot of product in the channel because there should be a lot of product in the channel. Planning season starts here in another 4 weeks or so. You need that product in place.*** So for example, preemergent herbicides, which are an important product line for us. You put those now at or before planting. That's the -- ***now is the time to have that product in the channel. So I think, from our own estimation and analysis, that levels of channel inventory are in line with the level of sales we've been having.***

Going around the rest of the world, in Asia, we marked on the call and our most recent earning call highlighted in India. ***India is another place where we have a little bit of a backup of channel inventory. We have 3 years in a row of sort of uneven or weak monsoons.*** And I'm not a weather forecaster. I just -- I do know that at some point you revert to me whether that's this year or next year. We went through a similar issue with Australia several years ago. We had a number of years of really pronounced drought. Now they've sort of reversed the threat, and it's a bit

of flooding. So I think, this year, India, which is our third largest country, is not likely to be a big contributor to growth as we try to manage through that channel inventory.

***Europe, generally speaking, pretty good shape.*** There's a few spots in Southern Europe where there's some pretty hot and dry weather last year. ***There's a little bit of inventory in the channel, but it's not significant.***

(Emphasis added.)

174.    When questioned further regarding whether he was "concerned overall" about "some pockets" of heightened inventory, Defendant Sandifer stated, "***No. No, I think we're managing. I think we know where the issues are, and we're going to manage it proactively***" (emphasis added).

***February 24, 2023 10-K***

175.    On February 24, 2023, the Company filed its annual report on Form 10-K with the SEC for 2022 (the "2022 10-K"), which was signed by Defendants Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Norris, Øvrum, Pallash, and Volpe. Regarding FMC's patents, the 2022 10-K stated the following:

> ***During 2022, we initiated proceedings to enforce several of our patents and trademarks against generic producers and infringers, resulting in multiple favorable judgments and settlements, including in India and China****. In early 2022, we received notice that certain third parties are seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals. Under Chinese law, the patents remain valid but are not enforceable pending appeal. Given the unique and specific Chinese patent laws and legal procedures at issue in that situation, we do not believe that the China Patent Review Board's decisions would materially impact our enforcement of similar patents in other countries. Patent challenges in response to enforcement efforts is expected as an ordinary defense tactic in patent enforcement cases, and have been raised in several of our enforcement cases to date; we intend to defend vigorously any diamide patents that are challenged. ***While we believe that the invalidity or loss of any particular patent, trademark or license***

*after appeal would be an unlikely possibility, our patent and trademark estate related to our diamide insect control products based on Rynaxypyr® and Cyazypyr® active ingredients in the aggregate are of material importance to our operations.*

(Emphasis added.)

176.    The 2022 10-K included the same misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property as the 2021 10-K.

### Bank of America Global Agriculture and Materials Conference Remarks

177.    On March 1, 2023, the Company attended the Bank of America Global Agriculture and Materials Conference (the "2023 Bank of America Conference"). At the conference, Defendant Douglas stated the following in response to a question regarding "the patent expiry outlook over the next couple of years" for the diamide insecticides:

> Listen, we've talked about the diamides a lot, obviously. We get a lot of questions about the patent estate. The patent estate is a matrix of just over 1,000 patents for the 2 molecules. The base composition of matter patents for Rynaxypyr started to come off last August. In some countries, we have runway in others. Same thing for Cyazypyr, which is the smaller molecule, the initial ones start to come off in August 2023 this year and again, spread out after that.
>
> *There are also significant patents related to the whole process of manufacturing. These molecules are 15 or 16 synthetic steps, and we have many of those steps patented. I think it's worth noting today that the only legal material that's available is from FMC, even though the original patent has come off. Why is that? Because of the strength of the rest of the patent portfolio. . . .*
>
> So we already have a strong network out there of people who are selling diamides, so in some cases, competing with us in different markets, in many cases, expanding the market by having routes to market or formulations that we don't have. That was the intent of the plan. That's what we're seeing today. *So we expect the diamide growth to continue.*
>
> Last year, diamides grew about 7%. I think in the mid- to long term, you're going to see them continue to grow in the mid-single digit. I think that's an important part of the algorithm of growth. They have been around for almost 20 years now. So that we talk about them as being new molecules, new technology, and they are, but they're coming off the end of their patent. *And you should expect at some point towards the end of this decade, you will see generic manufacturing.* That is what

happens. So we're ready for that. We anticipated and we'll continue to invest in the diamides.

(Emphasis added.)

178.     Subsequently, in response to a question regarding the Company's patent litigation in India, Defendant Douglas stated:

> **There's a couple of cases in India that we recently won, a couple of cases in China as well. It's interesting when we bought the assets in 2018, there was already illegal material being sold in China, way back in 2018.** That continues today. It's unfortunately a facet of the Chinese industry that many companies will not respect patents, and they go and make [il]legal materials. **So it's not as if we're not used to competing with products out there that are of inferior quality but they are illegal, and we will enforce our patents all over the world.**

(Emphasis added.)

179.     In the thirty-day period between February 23, 2023 (the day prior to filling the 2022 10-K) and March 23, 2023, Defendants Brondeau, Douglas, and Sandifer conducted several lucrative insider sales.

180.     Defendant Brondeau conducted four insider sales between February 23, 2023 and February 27, 2023, selling 7,679 shares for an approximate total of $988,842.

181.     Defendant Douglas conducted four insider sales between February 23, 2023 and February 27, 2023, selling 11,836 shares for an approximate total of $1,524,119.

182.     Defendant Sandifer conducted five insider sales between February 23, 2023 and March 3, 2023, selling 7,465 shares for an approximate total of $956,292.

183.     Thus, in total, in the thirty-day period before the Company filed the 2022 10-Q and March 23, 2023, Defendants Brondeau,, Douglas, and Sandifer sold 26,980 shares of Company common stock on insider information, for which they received an approximate total of $3.47million in proceeds. Their insider sales, made with knowledge of material nonpublic

information before the material misstatements and omissions were exposed, demonstrate their motives in facilitating and participating in the scheme.

184.    Additionally, on April 27, 2023, Defendant Volpe conducted an insider sale of 1,694 shares of Company common stock for an approximate total of $202,975 in proceeds.

### *May 1, 2023 Form 8-K and May 2, 2023 Earnings Call*

185.    On May 1, 2023, the Company published a press release, which it also filed a Form 8-K (the "Q1 2023 Release") with the SEC, reporting its financial results for its first fiscal quarter of 2023. The press release lowered FMC's second quarter 2023 outlook, in part because of reduced demand, which FMC represented was attributable to factors including "***channel inventory management in India"*** and *"[d]iamides partners adjusting inventory levels*" (emphasis added). The Individual Defendants also stated, during the accompanying earnings call, that increased channel inventories and associated destocking drove the reduced guidance for the quarter.

186.    The Q1 2023 Release also quoted Defendant Douglas, who stated that "FMC delivered a solid first quarter with strong pricing actions, growth of new products and cost discipline driving margin expansion. ***New product growth and expanded market access contributed to robust North America sales,*** which helped offset volume headwinds in other regions." (emphasis added).

187.    Regarding the Company's full-year guidance for 2023, the Q1 2023 Release stated:

> FMC is raising its full-year adjusted EBITDA guidance by $10 million at the midpoint. Full-year adjusted EBITDA is now expected to be in the range of $1.50 billion to $1.56 billion, representing 9 percent year-over-year growth at the midpoint based on the first quarter performance, continued pricing gains, positive product mix and projected input cost tailwinds.

188.    The Q1 2023 Release continued, quoting Defendant Douglas as stating the following, with respect to the Company's second quarter and full-year guidance:

We expect second quarter results to be largely in line with the prior year. We are raising our full-year EBITDA guidance, and narrowing our range, based on the first quarter performance and our expectation of continued pricing gains, positive mix supported by new products as well as input cost tailwinds that are projected to be realized in the second half of the year, particularly in the third quarter. ***The strength of our portfolio, diversity of crop mix and investments in market access have positioned us well to deliver another year of revenue and earnings growth as well as margin expansion.***

(Emphasis added.)

189.    The next day, on May 2, 2023, FMC hosted an earnings call to discuss its financial results for the first quarter or 2023, during which Defendant Douglas stated that FMC was "raising guidance for full year adjusted EBITDA by $10 million based on the first quarter outperformance, continued pricing gains, positive mix and projected cost tailwinds," and further represented that FMC now expected "***full year EBITDA to be in the range of $1.5 billion to $1.56 billion, representing 9% year-over-year growth at the midpoint***" (emphasis added). In response to a question about the Company's "volume growth outlook," Defendant Douglas stated:

The market is still operating at a very, very high level. ***On the ground usage is very robust in most part of the world.*** So the actual market itself is looking good in terms of soft commodity prices are remaining elevated, growers are looking to plant as much as they can . . . ***overall, the volume perspective as we go through the year will improve for FMC.***

(Emphasis added.)

190.    Later during the May 2, 2023 earnings call, UBS analyst Joshua David Spector asked:

I guess when you think about Latin America and the volume shortfalls in the first half because of the drought conditions, I guess, what gives you confidence that inventory levels aren't at risk to the back half or into next year? And kind of similarly on the diamides, where you talk about some partner channel destocking. What's the visibility that, that doesn't bleed into the second half as well?

191.    Defendant Douglas responded by stating that inventory destocking was already accounted for in FMC's guidance. In relevant part, he stated:

I think on the channel inventories, we'll see how we go through the second quarter. The markets are moving. You know what, *if the market doesn't change much, yes, there will be some channel inventory hangover as we go into the next season. That occasionally happens.* As the weather patterns improve as we go through the second quarter, we should be eating away at some of that inventory. So we'll see where the market gets to. Our expectation, as we're forecasting is for a more normal season as we enter Q4 and Q1 into next year in Latin America. *On the diamides, what we're telling you in our guidance now is that the partners that are reducing inventories, that's not just an event now that continues through the rest of the year. So that's already built into our forward-looking guidance.*

(Emphasis added.)

192.    Also during this call, Defendant Sandifer stated the following regarding FMC's

working capital and cash flow:

**I think the pattern of our working capital and our cash flow for the year is very similar to what you've seen in the last 4 years,** strongly negative in Q1, will be modestly positive in Q2, and then *you see significant positive cash flows in Q3 and Q4 . . . we expect a normal pattern as we go through the rest of the year.*

(Emphasis added.)

193.    The statements identified in ¶¶ 132-135, 138-148, 154-178, 185-189, and 191-192

were materially false and misleading and omitted to state material adverse facts necessary to make

the statements not misleading because they failed to disclose, *inter alia*, that: (1) FMC's

distributors and many of its retailers had, as a result of overbuying because of feared supply chain

disruptions wrought by the Pandemic, accumulated excessive inventory; (2) because these

customers carried excessive inventories, demand for FMC's products began significantly declining

in 2022 and 2023; (3) FMC's margins suffered as the Company attempted to boost sales through

discounts and received numerous returns of products that had been pre-purchased during the

Pandemic; (4) the introduction of low-cost generic competitors to the Company's largest revenue-

generating products,  Rynaxypyr and Cyazypyr, further hurt demand; (5) FMC's revenue growth

was further hampered by consolidation of FMC's distributors; and (6) because of the foregoing,

positive statements made concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### **The Truth Begins to Emerge as the False and Misleading Statements Continue**

### *May 2, 2023 Q2 2023 10-Q*

194.    The truth began to emerge on May 2, 2023 when the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2023. The Q2 2023 10-Q incorporated the misleading risk disclosures regarding increased competition and the Company's ability to protect its intellectual property that were contained in the Company's previously filed annual reports.

195.    On the news of the disclosures in the Q1 2023 10-Q and accompanying earnings call, the price of FMC stock declined 5.93%, from a closing price of $123.76 per share on May 1, 2023 to close at $116.42 per share on May 2, 2023. Despite this partial emergence of the truth, the price of the Company's stock remained significantly artificially inflated as the Individual Defendants continued to mislead the public about the Company's growth prospects.

### *2023 Goldman Sachs Industrials & Materials Conference*

196.    On May 9, 2023, Defendant Sandifer spoke on FMC's behalf at the Goldman Sachs Industrials & Materials Conference, touting the Company's purported growth despite adverse market conditions. In relevant part, he stated:

> Look, we reported last week earnings EBITDA that was about $7 million above the midpoint of our guidance range with earning -- EPS is well above midpoint of guidance range. Revenue was a bit lighter than what we had guided. But ***overall, a strong quarter. And I think -- we think about what's going on in our space, another demonstration of our ability to deliver earnings as guided and predicted despite market conditions.*** And that's been very much a hallmark of FMC, particularly over the last 5 years, and our current iteration is a focused agricultural sciences company. In the quarter itself, a bit of revenue softness, two key spots drought in South and Southern Brazil and Argentina was a driver certainly in the lower volumes in the quarter as was some lower volumes in the cereal herbicide

markets in Europe. ***I'd say low growth in Asia was expected and a very, very strong growth in North America also expected. So I think generally, the quarter largely as expected***, big -- the real surprise was a bit of softness in some of the core European markets, which I would attribute to both falling crop prices for cereals, a little bit of hesitancy in the channel there around the channel inventory levels and stocking. ***But in general, I'd say, overall, a solid quarter. So we have outperformed our guidance. We carried a little bit more than that through in a raise of guidance for the full year in part because we do feel confident in our ability to deliver at the midpoint of our guidance range, $1.53 billion in EBITDA for 2023 with about $6.15 billion in revenue. So what's changed? I think our guidance and our outlook for the year has always been predicated on growth, more balanced between price and volume than in previous years with pricing as a strong contributor mid-single-digit pricing for the year, a bit stronger than that in the first half, a little less than that in the second half, complemented by continued volume growth, basically independent of what market conditions are.*** We've been a steady compounding, growing 5% to 7%, actually a little bit above 7% compounded for 5 years now, irrespective of what the growth of the market has been in each year because it's really been driven by technology penetration, by new products and to a lesser degree and more recent degree by some investments we've made in expanding our market access ***by putting more people on the ground, agronomists, marketing salespeople to help people understand how help growers in particular, understand how best to utilize our products. And that's starting to really pull through some demand.***

(Emphasis added.)

197.    Later during the conference, Defendant Sandifer stated the following with respect

to generic competitors for the diamide insecticides:

> Some of the earliest patents which are around the composition of matter, composition of matter of the fundamental active ingredient molecules started rolling off last year. Despite that, ***there's not a single legal competitor in Rynaxypyr in the world today that said differently, that isn't buying it from us.*** Now there are illegal competitors and have been since before we bought the business**.** ***So there's been [illegal] material, particularly in China and India, always. But there are no current legal entrants in either of those markets where a the [sic] initial composition of matter patents have expired. And that's in part because that's just the beginning of the story around the patent protection.*** We have patents on manufacturing processes. And the diamides are 15- and 16-step process is to produce a molecule we have patents on many of those individual steps. We have patents on the composition, a matter of many of the intermediates that are produced in those steps. Many of those intermediates have no other commercial use of this to be made and further refined into being Rynaxypyr or Cyazypyr. We have patents on formulations of products. So while we had a couple of patents roll off last year, we also had a number of new patents granted, including for some value-

added formulations of Rynaxypyr, some of the new product growth we were talking about earlier. So the patent of the state is not a static asset. It is something that we're continuing to invest in, and we're continuing to renew. We have always presumed that over time, there would be generic entry into this marketplace. That's one of the reasons why we so aggressively pursued partnerships. . . . . So I think we've managed very aggressively that patent estate, the branding, the partnerships, continued innovation around those molecules. And while certainly, yes, we expect -- you're not going to grow doubling every 5 years forever, law of large numbers comes into play. *But we do see that the diamide family continuing to compound in that mid-single-digit range through the rest of the decade and continue to grow profit dollars, not just growing revenue.*

(Emphasis added.)

198.     Later, while responding to a subsequent question regarding channel inventory in the LATAM region, Defendant Sandifer stated:

I'd say there's a couple of hotspots around the world, but generally, we're pretty comfortable with channel inventory overall around the world, *places where we have a little -- some backup of channel inventory, Southern Brazil and Argentina, where there was a drought, and it was a pretty -- the consumption of crop chemicals was down a bit this year for the season that's wrapping up.* Certainly, there's a little bit of channel inventory there. . . . *But we see in demand for crop protection products being very, very healthy despite what may -- where there might be a little bit of channel inventory of different spots.*

(Emphasis added.)

199.     The statements in ¶¶ 196-198 were materially false and misleading and omitted material facts. Defendant Sandifer claimed that FMC's channel inventories were improving and downplayed the harm done to FMC's revenues by the proliferation of generic competition for its diamide insecticides in conjunction with channel inventory excess and related destocking activity despite having knowledge that inventories were in fact failing to improve as generic competition mounted in the face of litigation losses in China and India.

### *BMO Capital Markets Global Farm to Market Conference*

200.     On May 18, 2023, at the BMO Capital Markets Global Farm to Market Conference, Defendant Douglas stated the following regarding the Company's 2023 volumes:

> *When you think about actual volumes on the ground, so what is the grower using, volumes are very good.* So we're seeing acreage increase overall in Brazil, good conditions expected in the U.S., especially in the Midwest, other parts of the world in good condition . . . . *So the actual volume on the ground, what a grower is using, it might not be as high as 2022, but that was a record year. We're still at extremely high volumes. Where the volume discussion is, is what is happening in retail and distribution. So we feel good about the ultimate volume. It's managing through what is essentially the end of all the COVID supply chain issues that we've had that are bouncing through distribution and retail. So my message is really good volumes down on the field. We see that all over the world.* There are pockets where it's not so good, and we can talk about that later. *But overall, volumes are good.*

(Emphasis added.)

201.    Later during the conference, in response to a question about market dynamics and channel inventories across FMC's different regions, Defendant Douglas stated:

> Yes. *Start off in North America. We feel very good about where the U.S. and Canadian markets are.* We had a very good first quarter, which is getting ready for the season. Obviously, the planting season, things are going well. So I think the U.S., assuming the weather patterns hold, should have a very, very good season. Don't forget, soft commodity prices are still high. They're not at record highs, but they're well above average. Most of the 10- and 5-year stock-to-use ratios for many of the soft commodities are below the averages. You have more weather impacts, as you just said around the world. So I think growers are feeling bullish about their ability to actually earn more money from what they're producing, which is always a good sign. *So U.S., North America, all good. I would say, in Europe, Northern Europe, we're gearing up for the season once again. Northern Europe is in pretty good shape.* Southern Europe is dry. You look at the press on what is happening in Spain, parts of Italy, northern part of Italy, a lot of rain. So guess what the trend is I'm talking about here, it's volatile weather patterns, much more than we ever used to see 10 years ago. *But Europe, overall, pretty good. Southern Europe, a little dry. Asia, India, we've talked about a number of times. We have channel inventory in India, so do other people in the industry. A couple of bad years of monsoon, rice acreage reductions that is hopefully turning around this year. So we should work our way through that as we go through 2023.* Australia, very dry, unexpectedly. We had 3 years of very good weather. Now we're in a drought situation in Australia, which impacted Q1 in Asia. *Latin America, Brazil, the North Mexico, all good, the south of Brazil and Argentina, I think it's been well documented, extremely dry in Q4 and in Q1. That has continued. Argentina being the worst impacted. So I would expect channel inventories in Argentina or in the south of Brazil as we go through this season will remain elevated.* So it's as usual, a mixture of what we see in the world. But what we do see is those more volatile weather patterns occurring all over the world now.

68

(Emphasis added.)

202.    Moreover, regarding patents for FMC's Diamide Products, Defendant Douglas

stated:

> It's been a fantastic acquisition for us 5 years ago. When we bought that set of products, they were about $1 billion in size. Today, they are $2.1 billion. So we've more than doubled that business in 5 years. The chemistry is some of the most recent chemistry as an insecticide. It's very targeted. It has a great environmental profile. What we've done over the last 5 years is a couple of things. ***First of all, there is a very strong patent estate around these products. The composition of matter patents for one of the main molecules came off last year. However, there are numerous process patents, et cetera, that follow on from that, that allow us patent protection in some countries through 2029. What we did was also apply for more registrations.*** So for a generalist in this industry, it's one of the most regulated industries in the world, and you cannot sell a product without a registration. And that registration basically says you can sell this product at these rates, application rates on this crop in this geography, and you can't sell without that. What we've done is applied for more registrations for these products around the world on different crops in different geographies. ***So we still have a long runway of registrations to come. Something like 60% to 70% of the registrations we have, there is an additional amount to come. So we know we have a runway of taking share in markets where the products are not currently registered. That's good for us.*** It's good for the industry. The second piece is really the insecticide market is about a $16 billion market around the world. And there are some older chemistries that are losing their registrations around the world. Now when a product is removed from a registration, it means you can't sell it but the grower still needs products to sell -- to buy to take the pests away. So we're taking share from a lot of the older chemistries. So I think sort of the mid- to longer-term growth rate for these types of products are in the mid-single-digit range. I do see the fact that those molecules are very large now. I mean ***Rynaxypyr is one of the largest molecules in the world. You're reaching the law of big numbers. So mid-single digit for a $2.1 billion portfolio is a good growth rate. We believe that will continue as we -- as I said, take the registrations, take market share from older chemistries.***

(Emphasis added.)

203.    The statements in ¶¶ 200-202 were materially false and misleading and omitted

material facts. Defendant Douglas represented that FMC's channel inventory problems wrought

by the Pandemic had begun to correct, when in fact they had not, and furthermore that the

Company's ability to protect its intellectual property, particularly with respect to its ability to do so through enforcement of its patents, was significantly stronger than in fact it was.

### *July 10, 2023 Press Release*

204.    The truth continued to emerge on July 10, 2023 when the Individual Defendants partially revealed more of the truth, admitting in a press release that the Company had reduced its second quarter and full-year 2023 guidance. Therein, Defendant Douglas disclosed the following:

> ***Towards the end of May, we experienced unforeseen and unprecedented volume declines in three out of four operating regions, as our channel partners rapidly reduced inventory levels . . . Our full-year outlook for revenue and adjusted EBITDA has been revised to reflect these channel dynamics and their impact to volumes,*** as well as the benefit from improved input costs and the significant operating cost mitigation actions we have already implemented.

> (Emphasis added.)

205.    On this news, the price of FMC stock declined more than 11% in one day, from a closing price of $104.25 per share on Friday, July 7, 2023 to close at $92.63 per share on Monday, July 10, 2023.

### *August 3, 2023 Q2 Earnings Call*

206.    On August 3, 2023, during the Company's second quarter 2023 earnings call (the "Q2 2023 Earnings Call"), Salvator Tiano from Bank of America Capital Markets asked the following questions:

> You're talking about the destocking. So essentially, your view and your understanding is that diamide demand, whether it's branded products or from your partners, is holding up, but your partners like UPL are going above and beyond to lower their AI purchases firstly. And secondly, I think UPL specifically entered the U.S. market with its SHENZI product a few months ago. What is the impact for this to your own branded business in the U.S.?

207.    In response, Defendant Douglas stated the following:

> So first of all, when we talk about supply and technical-grade diamides to our partners, think of us as essentially a raw material supplier. So they're treating as a

raw material supplier, the same as we're treating our raw material suppliers. So it's nothing more than that. It is a simple case of they obviously have demands on their inventories that they're having to reduce, and we are part of that. We do that to our own suppliers and are doing it right now. So you see that. ***From a demand perspective, we don't think their demand is slowing down at all, neither [is] ours, as we just commented on. . . . .***

To the second part of your question with regards to competition in the U.S., we've seen competition for some time in many parts of the world with the diamides. What we do know is that our branded products and the new introductions that we're making of new formulations are moving the needle. ***In other words, we're not selling the same products that we were selling 5 years ago. We're selling more sophisticated, higher-concentration formulations to our current customers. So where generics are coming in with a certain type of product, we're not selling those products anymore. We're selling something completely different.***

(Emphasis added.)

208.    Later during the call, in response to a question regarding generic competitors in the market, Defendant Douglas stated:

Listen, generics play a major role in the marketplace. They have been around and they are around. ***We don't necessarily play in a lot of those markets.*** It's not to say that the markets they play in are not valuable, they are, ***but we don't have a lot of generic pressure in a lot of our product lines, mainly because of how we differentiate through either new active ingredients or new formulations that we bring to market.*** So I expect the generic market to get more competitive, but we don't play in that space.

(Emphasis added.)

209.    Later during the Q2 2023 Earnings Call, Defendant Douglas responded to a question regarding channel inventory destocking, specifically with respect to the Company's previous long-term issues with destocking. In relevant part, he stated:

Yes. 2015, you've got to remember back to 2015, it seems a long time ago now, but that was a particular event in Brazil. It was both inventory, it's currency impact. And it was, again, that scarcity of products leading into that. ***I think this is different in the sense of it's broader and it's happening much faster. In other words, the decreases we're seeing on a quarterly basis right now, they're much more extreme than they were before.*** I think the other thing for us, in particular, although there was a lot of people impacted by the Brazilian event, there was a new seed trait that was introduced into Brazil for soybeans, which impacted insecticides within a

reasonably short time frame. That was a factor that it's certainly not at play today in any way, shape or form. ***So I don't necessarily look back on Brazil as a proxy for what is happening today.***

(Emphasis added.)

### The Blue Orca Report

210.    On September 7, 2023, Blue Orca Capital published a report, which revealed previously undisclosed legal defeats that FMC had suffered in China and India pertaining to the enforceability of FMC's patents for Rynaxypyr and Cyazypyr. The Blue Orca Report also examined the rise of generic diamide products in the Indian, Chinese, and Brazilian markets.

211.    The Blue Orca Report disclosed how the Company "concealed from investors the deterioration of [its] core business[], resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." The Blue Orca Report further revealed that the Company "concealed from investors that it [had] suffered a recent string of stunning legal defeats around the globe that [had] enabled competitors to now launch competing generics at prices up to 80% below the price of FMC's flagship insecticide" products, Rynaxypyr and Cyazypyr. The Blue Orca Report continued:

> Despite the expiration of the composition patents on FMC's diamides, FMC tells investors it will not face generic competition on its flagship products until 2026 at the earliest because FMC still holds a suite of 'process' patents, which FMC claims will bar generic entrants for the next several years. Absurdly, FMC even tells investors that 'there is not a single legal competitor . . . in the world today.' This is simply not true.

212.    The Company responded the same day, broadly denying the allegations while claiming the Blue Orca report made "misleading and factually inaccurate statements regarding FMC's patents for its diamide insecticide technology and inaccurately speculated on the strength of FMC's business."

213.    On this news, the price of FMC stock declined 7.4% in one day, from a closing price of $82.19 per share on September 6, 2023 to close at $76.10 per share on September 7, 2023.

### October 23, 2023 Press Release

214.    On October 23, 2023, FMC issued a press release wherein it further reduced its third quarter and full-year 2023 revenue and earnings guidance, attributing its actions to "substantially lower sales volumes in Latin America, particularly destocking in Brazil and to a lesser degree drought in Argentina." The press release continued, quoting Defendant Douglas as stating the following, in relevant part:

> *During the third quarter, we observed continued channel destocking in all regions; however, the magnitude of the destocking in Brazil was much greater than we had anticipated. . . .* While application of products by growers remains stable, significant global restocking impacts are expected to persist into next year and we have adjusted our full year outlook accordingly. *With destocking conditions not expected to improve in the near-term, we have initiated an immediate restructuring process for our operations in Brazil and have launched a broader, more comprehensive process to review and adjust our total company cost structure.*

(Emphasis added.)

215.    FMC also substantially reduced its third quarter, fourth quarter and full-year 2023 revenue and Adjusted EBITDA guidance, including a decrease in the full-year 2023 revenue guidance of 9.2% to 17.0% and a decrease in the full-year Adjusted EBITDA guidance of 20.8% to 30.7%.

216.    On this news, the price of FMC stock declined roughly 16.2%, from a closing price of $66.95 per share on October 20, 2023 to close at $56.11 per share on October 24, 2023.

### THE TRUTH FULLY EMERGES

217.    The truth fully emerged one week later, on October 30, 2023, when FMC issued a press release announcing its financial results for its third quarter of 2023. The press release reported

that "*[t]he company is lowering full-year free cash flow guidance to a range of negative $860 million to negative $640 million due to the reduction in expected second half EBITDA and the impacts to working capital from higher inventory and lower payables.*" (emphasis added). The press release quoted Defendant Douglas as stating that "the global crop protection market remains challenged with *severe destocking across the channel impacting volume growth this year*. In this environment, *we are implementing a company-wide restructuring program to right-size our cost base.*" (emphasis added).

218.   Slides published on the Company's website indicated that third quarter revenues were down across all of FMC's regions, primarily due to "[l]ower volumes in all regions caused by destocking from channel customers and partners."

219.   The following day, during FMC's third quarter 2023 earnings call, Defendant Sandifer stated the following, in relevant part:

> *As of September 30, gross debt-to-EBIDTA was 3.6x, while net debt-to-EBITDA was 3.3x, reflecting the sudden deceleration of our earnings beginning in Q2 and elevated debt levels due to higher workings capital resulting from this deceleration.* . . . .
>
> In light of this and the reduced outlook for Q4, *we are currently in advanced discussions with our bank group to further amend our covenants to provide additional headroom for the company as we adjust our cost structure and debt levels to current market realities.*
>
> (Emphasis added.)

220.   Defendant Sandifer also stated the following regarding FMC's cash flow generation and outlook:

> FMC generated free cash flow of $32 million in Q3 down from $360 million in the prior year period. *Cash from operations declined $316 million, with lower EBITDA and substantially lower payables as we adjust our operations to match current demand.* . . . .

Year-to-date cash flow through September 30 was negative $790 million, $651 million lower than the prior year period. ***Nearly all of the reduction stems from lower cash from operations, which was down substantially due to lower EBITDA and lower payables.*** . . . .

We've reduced our free cash flow guidance for 2023 to negative $750 million at the midpoint, down from breakeven in our previous guidance. ***The reduction in full year cash flow outlook is a direct result of lower-than-expected second half EBITDA and the impact of reduced volumes on working capital.***

(Emphasis added.)

221.    On this news, the price of FMC stock declined more than 8%, from a closing price of $57.96 per share on October 30, 2023 to close at $53.20 per share on October 31, 2023.

## Subsequent Developments

### November 7, 2023 Amended Fifth Credit Agreement

222.    After the Relevant Period's end, further details pertaining to the Company's financial woes emerged. On November 7, 2023, FMC entered into an amendment to the Fifth Credit Agreement. This provided for a leverage ratio as high as 6.50:1.00 for the fourth quarter of 2023 and the first two quarters of 2024. In a same-day press release, Defendant Sandifer represented that the amendment provided "ample headroom and duration that is well beyond what we believe will be required as we navigate the current challenges to free cash flow."

223.    On November 16, 2023, during the Company's annual Investor Day Conference, Defendant Douglas disclosed that "[a] combination of inflationary prices and concerns about supply security during 2021 and '22 resulted in channel participants and growers over-stocking in the last couple of growing seasons."

224.    On June 11, 2024, Defendant Douglas abruptly resigned as FMC's President and CEO of FMC.

## REPURCHASES DURING THE RELEVANT PERIOD

225.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $123 million to repurchase 1,841,789 shares of its own common stock at artificially inflated prices between February 2022 and October 2023.

226.    According to the Form 10-Q filed with the SEC on May 3, 2022 (the "Q1 2022 10-Q"), between February 1, 2022 and February 28, 2022, the Company purchased 78,942 shares of its common stock for approximately $9,106,749 at an average price per share of approximately $115.36.

227.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $4,907,035 for repurchases of its own stock between February 1, 2022 and February 28, 2022.

228.    According to the Q1 2022 10-Q, between March 1, 2022 and March 31, 2022, the Company purchased 5,405 shares of its common stock for approximately $287,546 at an average price per share of approximately $112.47.

229.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $320,354 for repurchases of its own stock between March 1, 2022 and March 31, 2022.

230.    According to the Form 10-Q the Company filed with the SEC on August 3, 2022 (the "Q2 2022 10-Q"), between the period April 1, 2022 and April 30, 2022, the Company purchased 216 shares of its common stock for approximately $29,577 at an average price per share of approximately $136.93.

231.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $18,086 for repurchases of its own stock between April 1, 2022 and April 30, 2022.

232.    According to the Q2 2022 10-Q, between May 1 and May 31, 2022, the Company purchased 128 shares of its common stock for approximately $14,871 at an average price per share of approximately $116.18.

233.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $8,061 for repurchases of its own stock between May 1, 2022 and May 31, 2022.

234.    According to the Q2 2022 10-Q, between June 1, 2022 and June 30, 2022, the Company purchased 216 shares of its common stock for approximately $22,771 at an average price per share of approximately $105.42.

235.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $11,279 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

236.    According to the Form 10-Q the Company filed with the SEC on November 2, 2022 (the "Q3 2022 Form 10-Q"), between July 1, 2022 and July 31, 2022, the Company purchased 2,829 shares of its common stock for approximately $302,165 at an average price per share of approximately $106.81.

237.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $151,663 for repurchases of its own stock between July 1, 2022 and July 31, 2022.

238.    According to the Q3 2022 Form 10-Q, between August 1, 2022 and August 31, 2022, the Company purchased 303 shares of its common stock for approximately $22,174 at an average price per share of approximately $73.18.

239.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $6,054 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

240.    According to the Q3 2022 Form 10-Q, between September 1, 2022, and September 30, 2022, the Company purchased 130 shares of its common stock for approximately $13,815 at an average price per share of approximately $106.27.

241.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $6,899 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

242.    According to the Form 10-K the Company field with the SEC for the year ended December 31, 2022, on February 24, 2023 (the "2023 Form 10-K"), between October 1, 2022 to October 31, 2022, the Company purchased 875,724 shares of its common stock for approximately $100,025,195 at an average price per share of approximately $114.22.

243.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $53,436,678 for repurchases of its own stock between October 1, 2022 and October 31, 2022.

244.    According to the 2023 Form 10-K filed with the SEC, between November 1, 2022 and November 30, 2022, the Company purchased 3,999 shares of its common stock for approximately $481, 040 at an average price per share of approximately $120.29.

245.     As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $268,293 for repurchases of its own stock between November 1, 2022 and November 30, 2022.

246.     According to the 2023 Form 10-K field with the SEC, between December 1, 2022 and December 31, 2022, the Company purchased 33 shares of its common stock for approximately $4,178 at an average price per share of approximately $126.61.

247.     As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $2,423 for repurchases of its own stock between December 1, 2022 and December 31, 2022.

248.     According to the Form 10-Q filed on May 2, 2023, between the January 1, 2023 and January 31, 2023 (the "Q1 2023 10-Q"), the Company purchased 577 shares of its common stock for approximately $73,429 at an average price per share of approximately $127.26.

249.     As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $42,733 for repurchases of its own stock between January 1, 2023 and January 31, 2023.

250.     According to the Q1 2023 10-Q, between February 1, 2023 and February 28, 2023, the Company purchased 364,085 shares of its common stock for approximately $46,970,606 at an average price per share of approximately $129.01.

251.     As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $27,601,284 for repurchases of its own stock between February 1, 2023 and February 28, 2023.

252.    According to the Q1 2023 10-Q, between March 1, 2023 and March 31, 2023, the Company purchased 36,776 shares of its common stock for approximately $4,721,303 at an average price per share of approximately $128.38.

253.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $2,764,820 for repurchases of its own stock between March 1, 2023 and March 31, 2023.

254.    According to the Form 10-Q which FMC filed with the SEC on August 3, 2023 (the "Q2 2023 10-Q"), between April 1, 2023 and April 30, 2023, the Company purchased 2,551 shares of its common stock for approximately $307,574 at an average price per share of approximately $120.57.

255.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $171,861 for repurchases of its own stock between April 1, 2023 and April 30, 2023.

256.    According to the Q2 2023 10-Q, between May 1, 2023 and May 31, 2023, the Company purchased 464,999 shares of its common stock for approximately $50,880,191 at an average price per share of approximately $109.42.

257.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $26,142,244 for repurchases of its own stock between May 1, 2023 and May 31, 2023.

258.    According to the Q2 2023 10-Q, between June 1, 2023 and June 30, 2023, the Company purchased 43 shares of its common stock for approximately $4,539 at an average price per share of approximately $105.55.

259.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $2,251 for repurchases of its own stock between June 1, 2023 and June 30, 2023.

260.    According to the Form 10-Q which the Company filed with the SEC on November 7, 2023 (the "Q3 2023 10-Q"), between July 1, 2023 and July 31, 2023, the Company purchased 373 shares of its common stock for approximately $35,663 at an average price per share of approximately $95.61.

261.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $15,819 for repurchases of its own stock between July 1, 2023 and July 31, 2023.

262.    According to the Q3 2023 10-Q, between August 1, 2023 and August 31, 2023, the Company purchased 1,480 shares of its common stock for approximately $130,388 at an average price per share of approximately $88.10.

263.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $51,652 for repurchases of its own stock between August 1, 2023 and August 31, 2023.

264.    According to the Q3 2023 10-Q, between September 1, 2023 and September 30, 2023, the Company purchased 2,151 shares of its common stock for approximately $162,056 at an average price per share of approximately $75.34.

265.    As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $47,623.14 for repurchases of its own stock between September 1, 2023 and September 30, 2023.

266.     According to the Form 10-K which the Company filed with the SEC on February 27, 2024 (the "2023 10-K"), between October 1, 2023 and October 31, 2023, the Company purchased 829 shares of its common stock for approximately $52,260 at an average price per share of approximately $63.04.

267.     As the Company's stock was actually worth only $53.20 per share, the price at closing on October 31, 2023, the Company overpaid by approximately $8,157 for repurchases of its own stock between October 1, 2023 and October 31, 2023.

268.     Thus, the total payment by the Company for its repurchases during the Relevant Period was approximately $213.9 million as the Company repurchased 1,841,789 shares of its own stock at artificially inflated prices, representing a total overpayment of approximately $115.99 million.

## DAMAGES TO FMC

269.     As a direct and proximate result of the Individual Defendants' conduct, FMC has lost and expended, and will continue to lose and expend, many millions of dollars.

270.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

271.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

272.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

273.    Such losses include the Company's overpayment of approximately $115.99 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

274.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

275.    As a direct and proximate result of the Individual Defendants' conduct, FMC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## **DERIVATIVE ALLEGATIONS**

276.    Plaintiff brings this action derivatively and for the benefit of FMC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of FMC, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 10(b), 20(a), and 21D of the Exchange Act.

277.    FMC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

278.    Plaintiff is, and has been at all relevant times, a shareholder of FMC. Plaintiff will adequately and fairly represent the interests of FMC in enforcing and prosecuting its rights, and,

to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

279.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

280.    A pre-suit demand on the Board of FMC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Defendants Brondeau, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin (the "Director-Defendants"), and non-parties Anthony DiSilvestro and Steven T. Merkt (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of the thirteen Directors that were on the Board at the time this action was commenced.

281.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

282.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein, and, at the same time, causing the Company to overpay by approximately $115.99 million for repurchases of its own stock during the Relevant

Period while the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

283.    Additional reasons that demand on Defendant Brondeau is futile follow. Defendant Brondeau has served as the Company's CEO since June 2024 and as Chairman of the Board since October 2010. He was also CEO of FMC from January 2010 until May 2020, President from January 2010 until May 2018, and Executive Chairman from June 2020 to April 2021. In addition, Defendant Brondeau serves as the Chair of the Executive Committee. The Company provides Defendant Brondeau with his principal occupation, for which the Company compensates him handsomely. Consequently, Defendant Brondeau is, per the Company's own admission, a non-independent director. Defendant Brondeau also signed the false and misleading 2022 10-K. As FMC's highest officer, and a trusted long-time FMC director, Defendant Brondeau conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Brondeau's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. For these reasons, too, Defendant Brondeau breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

284.    Additional reasons that demand on Defendant Cordeiro is futile follow. Defendant Cordeiro has served as a Company director since 2011. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee and the Executive Committee. The Company provides Defendant Cordeiro with handsome compensation for his role as a director. Defendant Cordeiro also signed the false and misleading 2022 10-K. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Cordeiro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

285.    Additional reasons that demand on Defendant Davidson is futile follow. Defendant Davidson has served as a Company director since July 2020. Defendant Davidson also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. The Company provides Defendant Davidson with handsome compensation for his role as a director. Defendant Davidson also signed the false and misleading 2022 10-K. As a trusted Company director, Defendant Davidson conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

286.     Additional reasons that demand on Defendant Fortmann is futile follow. Defendant Fortmann has served as a Company director since 2022. Defendant Fortmann also serves as a member of the Compensation and Human Capital Committee and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Fortmann with handsome compensation for her role as a director. Defendant Fortmann also signed the false and misleading 2022 10-K. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Fortmann breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

287.     Additional reasons that demand on Defendant Greer is futile follow. Defendant Greer has served as a Company director since April 2002. Defendant Greer also serves as the Lead Independent Director, as a member of the Executive Committee, and as a member of the Nominating and Corporate Governance Committee. The Company provides Defendant Greer with handsome compensation for his role as a director. Defendant Greer also signed the false and misleading 2022 10-K. As a trusted Company director, Defendant Greer conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Greer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

288.    Additional reasons that demand on Defendant Johnson is futile follow. Defendant Johnson has served as a Company director since 2013. Defendant Johnson also serves as the Chair of the Compensation and Human Capital Committee, as a member of the Executive Committee, and as a member of the Sustainability Committee. The Company provides Defendant Johnson with handsome compensation for her role as a director. Defendant Johnson also signed the false and misleading 2022 10-K. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Johnson's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate her motive to participate in the scheme. For these reasons, too, Defendant Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

289.    Additional reasons that demand on Defendant Kempthorne is futile follow. Defendant Kempthorne has served as a Company director since 2009. Defendant Kempthorne also serves as the Chair of the Sustainability Committee and as a member of the Compensation and Human Capital Committee. The Company provides Defendant Kempthorne with handsome compensation for his role as a director. Defendant Kempthorne also signed the false and misleading 2022 10-K. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant

Kempthorne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

290.     Additional reasons that demand on Defendant Øvrum is futile follow. Defendant Øvrum has served as a Company director since 2016. She also serves as a member of both the Sustainability and Nominating and Corporate Governance Committees. The Company provides Defendant Øvrum with handsome compensation for her role as a director. Defendant Øvrum also signed the false and misleading 2022 10-K. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Øvrum breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

291.     Additional reasons that demand on Defendant Pallash is futile follow. Defendant Pallash has served as a Company director since 2008. He also serves as a member of the Audit Committee and as a member of the Sustainability Committee. The Company provides Defendant Pallash with handsome compensation for his role as a director. Defendant Pallash also signed the false and misleading 2022 10-K. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Pallash breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

292.    Additional reasons that demand on Defendant Verduin is futile follow. Defendant Verduin has served as a Company director since 2023. She also serves as a member of the Compensation and Human Capital Committee and as a member of the Sustainability Committee. The Company provides Defendant Verduin with handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Verduin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

293.    Additional reasons that demand on the Board is futile follow.

294.    Defendants Cordeiro (as Chair), Davidson, and Pallash (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

295.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

296.    FMC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FMC any part of the damages FMC suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

297.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

298.    The acts complained of herein constitute violations of fiduciary duties owed by FMC's officers and directors, and these acts are incapable of ratification.

299.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of FMC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of FMC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

300.    If there is no directors' and officers' liability insurance, then the Directors will not cause FMC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

301.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## <u>FIRST CLAIM</u>

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

302.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

303.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding FMC. Not only is FMC now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon FMC by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 62,920 of its own shares at artificially inflated prices, damaging FMC.

304.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

305.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FMC not misleading.

306.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by FMC.

307.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

308.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

309.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

310.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

311.    The Individual Defendants, by virtue of their positions with FMC and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of FMC and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause FMC to engage in the illegal conduct and practices complained of herein.

312.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

313.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

314.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of FMC's business and affairs.

315.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

316.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of FMC.

317.    In breach of their fiduciary duties owed to FMC, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) FMC's distributors and many of its retailers had, as a result of overbuying because of feared supply chain disruptions wrought by the Pandemic, accumulated excessive inventory; (2) because these customers carried excessive inventories, demand for FMC's products began significantly declining in 2022 and 2023; (3) FMC's margins suffered as the Company attempted to boost sales through discounts and received numerous returns of products that had been pre-purchased during the Pandemic; (4) the introduction of low-cost generic competitors to the Company's largest revenue-generating products, Rynaxypyr and Cyazypyr, further hurt demand; (5) FMC's revenue growth was further hampered by consolidation of FMC's distributors; and (6) because of the foregoing, positive

statements made concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

318.    In further breach of their fiduciary duties, the Individual Defendants caused the Company to repurchase 1,841,789 shares of Company common stock for approximately $213,968,443 million total while the Company's stock price was artificially inflated due to the false and misleading misrepresentations alleged herein, resulting in the Company overpaying by approximately $115.99 million.

319.    In further breach of the their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

320.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

321.    In yet further breach of their fiduciary duties, during the Relevant period, while the Company's stock was trading at artificially inflated prices before the fraud was exposed, five of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $9.01 million.

322.    The Individual Defendants had actual or constructive knowledge that they had issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omission of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of FMC's securities and disguising insider sales.

323.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of FMC's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

324.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

325.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FMC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

326.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## <u>FOURTH CLAIM</u>

### Against the Individual Defendants for Unjust Enrichment

327.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

328.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, FMC.

329.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from FMC that was tied to the performance or artificially inflated valuation of FMC or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

330.    Plaintiff, as a shareholder and a representative of FMC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

331.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Abuse of Control

332.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

333.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence FMC, for which they are legally responsible.

334.    As a direct and proximate result of the Individual Defendants' abuse of control, FMC has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, FMC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

335.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

336.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

337.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of FMC in a manner consistent with the operations of a publicly held corporation.

338.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, FMC has sustained and will continue to sustain significant damages.

339.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

340.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

341.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

342.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

343.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused FMC to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil

inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

344.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

345.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

346.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## EIGHTH CLAIM

**Against Defendants Douglas and Sandifer for Contribution Under Sections 10(b) and 21D of the Exchange Act**

347.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

348.    FMC and Defendants Douglas and Sandifer are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Douglas's and Defendant Sandifer's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

349.    Defendants Douglas and Sandifer, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

350.    Accordingly, Defendants Douglas and Sandifer are liable under 15 U.S.C. § 78j(b),

which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

351.    As such, FMC is entitled to receive all appropriate contribution or indemnification from Defendants Douglas and Sandifer.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of FMC, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to FMC;

(c)    Determining and awarding to FMC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing FMC and the Individual Defendants to take all necessary actions to reform and improve FMC's corporate governance and internal procedures to comply with applicable laws and to protect FMC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of FMC to nominate at least seven candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding FMC restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 2, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth Donohoe*
Elizabeth Donohoe
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: AB15E8B0-22DF-4F82-A524-E0606B7AF3F8

## <u>VERIFICATION</u>

I, Steven Curavo, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26 day of May, 2025.

Signed by:

Steven W Curavo

E298BD21E933485...

Steven Curavo